(No. 51940.—)

BRUNSWICK CORPORATION, Appellee, v. OUTBOARD MARINE CORPORATION *et al.,* Appellants.

*Opinion filed March 21, 1980.—Rehearing denied May 29, 1980.*

476

Robert E. Clemency, of Milwaukee, and Louis W. Brydges, of Waukegan (Michael, Best & Friedrich and Brydges, Riseborough, Morris, Franke & Miller, of counsel), for appellant.

Robert L. Stern, Erwin C. Heininger, William Thomas Braithwaite and Judith M. Janssen, of Chicago (Mayer, Brown & Platt, of counsel), for appellee.

MR. JUSTICE RYAN delivered the opinion of the court:

Plaintiff, Brunswick Corporation, brought an action to enjoin former employee Ronald R. Anderson from disclosing alleged trade secrets and to enjoin Outboard Marine Corporation (OMC), Anderson's current employer, from utilizing alleged trade secrets already obtained or obtained through Anderson. On November 14, 1977, the trial court granted the defendant's motion for summary judgment. The appellate court reversed the judgment of the trial court. (69 Ill. App. 3d 106.) We granted defendant's petition for leave to appeal. The primary issue is whether the owner of a trade secret loses the right to injunctive relief when a defendant acquires the secret illegally but voluntarily abstains from using it for a period in excess of the time it could be developed independently.

OMC and the plaintiff's Mercury Division compete in the manufacturing and sale of outboard motors, and in outboard motor boat racing. The parties use the results of the races in their advertising to promote the sale of their

commercial engines. Anderson was employed as a research and development engineer by Mercury from August 12, 1971, through November 30, 1976. In 1972 or 1973, Mercury engineers conceived the idea of installing a mechanical fuel injection system manufactured by Bendix Corporation on Mercury's 6-cylinder T-3 outboard racing engine. Mercury began racing with this system in the fall of 1973 after investing an undetermined amount of time and money into the system. The system proved to be a success, and Mercury won numerous races while employing this system. Mercury attempted to keep the adaptation of the Bendix fuel-injection system secret. Anderson worked on the development and refinement of this system during his employment with the plaintiff.

In January 1975, Cees Van der Velden, a race driver for Mercury, became employed by OMC. During this employment, he made disclosures to engineers and officers of OMC concerning Mercury's adaptation of the Bendix fuel-injection system and made a sketch of its adaptation. Mercury did not learn of these disclosures at this time. In December 1976, Anderson left Mercury and commenced working for OMC. After the plaintiff learned that Anderson had ordered a fuel-injection system from Bendix of the type they employed, the plaintiff instituted this suit in May 1977.

The trial court found the time required to successfully install a Bendix mechanical-fuel-injection system on an outboard engine for use in competitive boat racing would be, from conception to project completion, anywhere from 8 to 12 months. It also found that if OMC had tried to install a Bendix fuel-injection system on its racing engines, using the Van der Velden disclosures, it could have successfully completed the project by not later than November 30, 1976. In granting defendant's motion for summary judgment the trial court relied upon *Northern Petrochemical Co. v. Tomlinson* (7th Cir. 1973), 484

F.2d 1057. In *Northern,* a diversity case governed by Illinois law, the Federal court interpreted *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, and *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, as holding that an abstention by a thief from the use of a trade secret, for a period in which it could have been developed lawfully, prevented the victim from enjoining the use at a later time. Thus, the trial court determined this action was barred.

The appellate court examined the *Northern* opinion and concluded that the Federal court of appeals misconstrued Illinois law. We do not find the holding in *Northern* to be helpful in this case. Also, *ILG Industries* and *Schulenburg,* while helpful, are also not in point.

In *Schulenburg* and *ILG,* the length of the injunction was held to be, where ascertainable, the period of time necessary for the defendant to copy or develop the trade secret by lawful means. In all three of these cases the trade secret had been incorporated in a product which was available to the general public. These items could have been acquired by anyone and the trade secret discovered through the process of reverse engineering.

The judicial application of trade secret law has advanced two doctrinal bases for trade secret protection: (1) encouragement of invention and (2) maintenance of commercial morality. (See Johnson, *Remedies in Trade Secret Litigation,* 72 Nw. U.L. Rev. 1004 (1978).) In *Kewanee Oil Co. v. Bicron Corp.* (1974), 416 U.S. 470, 481, 40 L. Ed. 2d 315, 325, 94 S. Ct. 1879, 1886, the Supreme Court stated: "The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law." Actually, a third element enters into the shaping of the remedy, that is, a public interest in having free competition in the sale and manufacture of goods not protected by a valid patent. (See Stern, *A Reexamination of Preemption of State Trade Secret Law After Kewanee,*

42 Geo. Wash. L. Rev. 927, 978 (1974).) Thus, although *ILG Industries* and *Schulenburg* stated the general principles concerning injunctive relief for trade secret violations, the exact nature and duration of the remedy must be tailored to fit the facts of the particular case. In *ILG Industries* this court, although defining the duration of the injunction as above stated, nonetheless held that the 18-month injunction period ran from July 31, 1969, the date of the injunction order, and not the date that the trade secrets were wrongfully acquired. (After checking the record in *ILG Industries* it is apparent that there is a typographical error in the opinion of the case on page 90 of 49 Ill. 2d. The date of the termination of Scott's employment as reflected by the record was December 31, 1968, and not December 31, 1969, as stated in the opinion (49 Ill. 2d 88, 90)).

In applying the three doctrinal bases to the facts of a case, one must consider that a permanent injunction, while punishing the wrongdoer, thereby promoting commercial morality, would, if the secret were lawfully discoverable, give to the plaintiff a windfall protection and would subvert the public interest in fostering competition and in allowing employees to make full use of their knowledge and ability. If no injunctive relief is granted, the faithless employee and wrongdoing competitor would be unpunished and would retain the benefit of a head start advantage over legitimate competitors. The innovator of the trade secret would also be afforded no protection. By enjoining the use of wrongfully acquired trade secrets for the approximate length of time it would require a legitimate competitor to develop a competitive product following a lawful disclosure of the information, the wrongdoer is deprived of any advantage from his wrongdoing, the developer of the trade secret is placed in the same position it would have occupied if the breach of confidence had not occurred, and the minimum restraint

consistent with the other objectives would be placed upon competitors and the utilization of the competitors' and the employees' skills. See *Winston Research Corp. v. Minnesota Mining & Manufacturing Co.* (9th Cir. 1965), 350 F.2d 134, 142.

In our case there was no finding by the court that there was ever a lawful disclosure of the trade secret. The court found that it would take one year to reproduce this engine through the process of reverse engineering. This it considered to be the length of time that the defendant could be required to abstain from production. The court measured this period of time from the disclosure of the trade secret by Van der Velden and concluded that since the defendant had abstained from producing the engine longer than the time it would take to develop it, the plaintiff was not entitled to an injunction. However, the disclosure by Van der Velden is conceded to have been tortious. The plaintiff's racing engine is not sold to the general public, and the record does not indicate that there has been any lawful disclosure of the trade secret from which this information could be discovered through reverse engineering or otherwise. Furthermore, the 1-year period the trial court found as the time it would take to reproduce the trade secret comes from an affidavit of a vice-president of the company stating that it would take from 8 to 12 months at a minimum from conception to completion for a competitor to develop an engine using the Bendix fuel-injection system. This statement, however, appears to have been made in connection with the previous paragraph in the affidavit which referred to developing the system from photographs or sketches of the Mercury engine and through reverse engineering from such sketches or photographs. There appears to be no evidence in the record as to how long it would take to reproduce plaintiff's trade secret absent the tortious disclosure of the information. The facts actually involved in this case

can be fully developed when the case is heard on its merits on retrial and the appropriate relief, if any, fashioned from the principles of trade secret law reviewed in this opinion.

We hold that the trial court erred in granting summary judgment in favor of the defendants. The judgment of the appellate court is therefore affirmed, and the cause is remanded to the circuit court of Lake County for further proceedings in accordance with this opinion.

*Affirmed and remanded.*