**SYNTEX OPHTHALMICS, INC., et al., Appellees,**

v.

**Nick N. NOVICKY, et al., Appellants.**

**George F. TSUETAKI, et al., Appellees,**

v.

**Nick N. NOVICKY, et al., Appellants.**

**Appeal Nos. 84–838, 84–857 \*.**

United States Court of Appeals, Federal Circuit.

Oct. 3, 1984.

\* For some reason, two separate appeals (identical in content) were noted by appellant; we treat the two appeals as, in reality, one appeal. Tsuetaki, *et al.*, did not participate in this appeal.

were Joseph A. DeGirolamo, New York City, of counsel, and Holland C. Capper, Chicago, Ill., of counsel.

Before DAVIS, Circuit Judge, NICHOLS, Senior Circuit Judge, and BALDWIN, Circuit Judge.

DAVIS, Circuit Judge.

Appellant Novicky seeks review of four related decisions of the United States District Court for the Northern District of Illinois: (1) a grant of summary judgment for appellee Syntex, deciding that Syntex has title to all of the patents and patent applications naming Novicky as inventor;[1] (2) a decision holding that Novicky misappropriated Syntex's trade secrets;[2] (3) a final injunction, enjoining Novicky for a twenty-year period from using or disclosing Syntex's trade secrets;[3] and (4) a denial of Novicky's motion to remand the proceedings back to state court.[4]

We affirm the grant of summary judgment on the patent issue as to six of the eight patents and applications covered by that decision and remand to the District Court the question of Syntex's title as to the other two patents. On the issue of trade secret misappropriation, we affirm the District Court's holding that Novicky misappropriated Syntex's trade secrets, but reverse the court's twenty-year injunction and remand for reasons explained *infra.* Finally, we affirm the District Court's denial of Novicky's motion to remand the state action back to state court.

Keith V. Rockey, Chicago, Ill., argued, for appellant Novicky.

James W. Gould, New York City, argued for appellee Syntec. With him on the brief

1. *Syntex Ophthalmics, Inc. v. Novicky,* No. 80 C 6257 (N.D.Ill. June 13, 1983).

2. *Syntex Ophthalmics, Inc. v. Novicky,* 591 F.Supp. 28 (N.D.Ill.1983).

3. *Syntex Ophthalmics, Inc. v. Novicky,* No. 80 C 6257 (N.D.Ill. Feb. 9, 1984).

4. *Tsuetaki v. Novicky,* No. 81 C 4050 (N.D.Ill. Feb. 13, 1984).

I

Background

A. *The Polycon project and Novicky's employments:* The roots of this complex

Novicky does not seem to be appealing from the District Court's denial (in June 1983) of Novicky's motion to file a new counterclaim alleging illegal dumping in count one and attacking the validity of the Gaylord patents in count two. Consequently, we do not address those issues directly, although the parties touch upon them in their briefs.

litigation[5] go back to 1977. Early in that year, the appellees, Syntex Ophthalmics, Inc. and Arapahoe Chemicals, Inc. (collectively referred to as "Syntex")[6] embarked on a joint venture for research and commercial development of a contact lens material from which rigid gas-permeable contact lenses could be made.[7] They called their venture the "Polycon project". Appellant Novicky, who had been employed by Arapahoe since 1973, was selected to be a chemist on the Polycon project. This litigation arises out of that employment relationship.

When first employed by Arapahoe in 1973, Novicky signed a standard Syntex employment agreement, promising confidentiality and assigning to Syntex all ideas and inventions conceived or developed by him while at Syntex. The agreement provided, in pertinent part:

3. Disclosure of Information and Assignment and Ownership of Ideas. The Employee agrees to fully disclose, deliver, transfer and assign to Employer, his entire right, title and interest in and to any and all ideas, methods, inventions, devices and improvements, whether patentable or not, originating with, conceived, acquired or developed by Employee, either solely or jointly with others during any times, whether during working hours or not, when the Employee is employed by Employer, if the same be reasonably related to Employer's actual operations. All such ideas, methods, inventions, devices, and improvements are hereafter jointly and severally referred to as "ideas".

The parties hereto agree that for purposes of Paragraphs (3) and (4) herein, the Employee shall be deemed as Employee of the Company twenty-four (24) hours a day for every day during the year notwithstanding any leaves of absence, vacations, or other leave.

4. Secrecy: The Employee recognizes and acknowledges that various secrets and/or facts as defined below, are valuable, special and unique assets of the Employer's business. The Employee agrees that during the term of his employment he will use the aforementioned various secrets and/or facts only in connection with his employment with Employer, and that during and after the term of his employment he will not use or disclose any of the various aforementioned secrets and/or facts either on his own behalf or the behalf of any other person or entity.

The phrase "secrets and/or facts" as used herein shall include, in addition to its usual meaning, any processes, ideas and other information pertaining to research, development, production, and other business or activities of Employer (and/or Employer's customers), and Employer's list of customers.

At least in its initial phases, the Polycon project was based on two U.S. patents (the Gaylord patents) and some preliminary manufacturing batch sheets[8] which Syntex had purchased as part of its acquisition of Polymer Optics Corporation. The patents disclose processes for synthesizing certain

5. Counsel greatly added to the complexity of this case by failing to provide an adequate index for their seventeen-volume appendix. In particular, counsel's haphazard indexing of the opinions of the various courts that have heard aspects of the case made this court's work considerably more difficult.

6. Syntex Ophthalmics, Inc. and Arapahoe Chemicals, Inc. are sister subsidiaries of Syntex (U.S.A.), Inc. Since the initiation of this litigation Arapahoe Chemicals has changed its name to Syntex Chemicals.

7. Prior to the development of rigid, gas-permeable lenses, contact lens wearers often wore

"hard" contact lenses. These lenses blocked the transmission of oxygen to the wearer's cornea, a condition which can lead to corneal swelling. Gas permeable lenses allow oxygen to reach the cornea and, for that reason, can be worn for longer periods of time than "hard" lenses.

8. The District Court described a batch sheet as: "a cross between a recipe from a cookbook and a laboratory notebook. The batch sheet contains instructions about how to carry out a procedure or reaction with spaces for the chemist to enter data about reaction conditions and results."

silicone monomers and using them to create an oxygenpermeable plastic lens material. Novicky's role in the project was to develop processes for the commercial development of this contact lens material which would optimize a combination of properties such as high oxygen permeability, wettability, rigidity, and transparency.[9] The procedures Novicky and others followed in the preparation of the Polycon material and its component ingredients were recorded on "Arapahoe batch sheets" which were used as a basis for further refining the Polycon process. Novicky was also involved in developing or revising analytical procedures to determine if the raw, intermediate, and finished materials would satisfy the Food and Drug Administration's (FDA's) requirements. The details of the relevant specifications and analytical methods were recorded on Specification and Analytical Method sheets and incorporated in an FDA master file.

In addition to his regular duties, Novicky experimented with alternative silicone monomers, trying to improve the permeability of the lens material to be used in manufacturing the contact lenses. Syntex had already designated a specific silicone monomer (T–2) to be used in the Polycon material for which it was seeking FDA approval.

In December 1977, Novicky prepared, signed, and had two Syntex employees witness a patent disclosure dealing with certain of the alternative silicone monomers he had developed. Those monomers and the processes related to them were apparently the basis for two patents Novicky obtained in 1980 and 1981, U.S. Patent Nos. 4,242,483 and 4,248,989 (the " '483 and '989 patents", or the so-called "private patents").

On May 12, 1978, Novicky's employment with Syntex was terminated. Four days later, on May 16, 1978, Novicky prepared a second patent disclosure statement regarding other monomers he claimed to have discovered for use in making gas-permeable lens materials (one of which was later designated the S–9 monomer and patented under U.S. Patent No. 4,216,303 (the " '303 patent")). According to Novicky, the discovery contained in the May 16th disclosure had been prompted by his "review" of a 1961 German article on silicone chemistry subsequent to leaving Syntex.

In August 1978, Novicky began negotiating with Tsuetaki, a Chicago optometrist and the president and sole owner of a small optical company (Fused Kontacts of Chicago, Inc.)[10] for the sale of the technology embodied in the May 16th patent disclosure. Tsuetaki and Novicky agreed that Tsuetaki would hire Novicky as a chemist to develop a commercial operation for the manufacture of the new lens material. Novicky signed an employment agreement, promising, *inter alia*, to assign to Tsuetaki all patentable and unpatentable inventions, developments, or improvements he produced, within or without the scope of his employment, for the life of the agreement (August 31, 1978—August 31, 1982) plus six months. Novicky resigned his job with Tsuetaki in May 1980.

B. *The state and federal litigation:* In July 1980, Tsuetaki sued Novicky in the Cook County Circuit Court (an Illinois trial court) for breach of his employment contract. After a sixteen-day bench trial, the state court issued its decision in January 1981. *Tsuetaki v. Novicky*, No. 80 CH 4724 (Ill.Cir.Ct. Jan. 13, 1981). It held, *inter alia*, that the employment agreement was binding and ordered Novicky to assign to Tsuetaki "any and all interest" he had in the patents he had obtained and the patent applications he had filed pertaining to contact lens technology. The state court also

---

**9.** Contact lenses are made by reacting certain chemical compounds (monomers) into plastics (copolymers) by a process called polymerization. The plastic lens material is then formed in the shape of rods which are subsequently sliced into discs (buttons) which are then ground into lenses. Novicky's job was to optim- ize processes and procedures for making the polymer rods.

**10.** Tsuetaki and his company, Fused Kontacts of Chicago, Inc., are collectively referred to as Tsuetaki.

enjoined Novicky from "disclosing to any person or entity the contents ... of any laboratory books and records dealing with the experiments, research, progress, and development of the technology involved in the manufacture of contact lenses ..." and from "disseminating matters confidential to George Tsuetaki and/or Fused Kontacts of Chicago, Inc."

While the state proceedings were pending, Syntex filed this suit (in November 1980) in the federal District Court below, against Tsuetaki and Novicky for misappropriation of trade secrets. Later, Syntex amended its complaint to add an additional count claiming title to certain patents and patent applications naming Novicky as inventor, and seeking relief for patent infringement. The court's jurisdiction was invoked under 28 U.S.C. § 1332 and 28 U.S.C. § 1338. In May 1981, the court severed Syntex's patent infringement claims, pending resolution of the patent title and the trade secret questions.[11]

One consequence of the federal proceedings was that Tsuetaki initiated contempt proceedings (in February 1981) against Novicky and Syntex in state court. Tsuetaki claimed that Novicky had disobeyed the court's January 1981 order against "disseminating matters confidential to George Tsuetaki" by improperly conferring with Syntex's attorney about patent rights, disclosures, and other matters in the context of the federal court litigation.

Both Syntex and Novicky opposed Tsuetaki's petition in the state court. Syntex also cross-petitioned for a stay of certain paragraphs of that court's January 1981 order until the federal District Court (in the present litigation) decided the respective rights of the three parties in the property the state court had held Tsuetaki owned.

Subsequently Tsuetaki requested permission from the state court to add Syntex as a defendant in a supplemental complaint. That court granted Tsuetaki's motion on July 10, 1981, saying that Syntex, by filing

its cross-petition and responding to Tsuetaki's petition, had made a general appearance, thereby submitting itself to the jurisdiction of the state court. Tsuetaki added a fifth count to its original complaint, seeking declaratory relief as to both Syntex and Novicky. In essence, Tsuetaki sought a declaration that the property which it had purchased from Novicky no longer belonged to either Syntex or Novicky.

On July 14, 1981 Novicky filed a notice of appeal seeking review of both the trial court's original judgment and its order of July 10th which had denied Novicky's prayer for post-trial relief. Three days later, Syntex filed a petition in the District Court to remove the "action ... pending in the Circuit Court [the state trial court]" to federal court. That petition was granted by the District Court in September 1981. In March 1982, the District Court denied Tsuetaki's motion for remand.

In the meantime, Novicky filed with the state trial court (in September 1981) a petition under a special provision of Illinois law, asking that the judgment of the trial court be vacated on the basis of newly discovered evidence arising from the federal proceedings. The state trial court dismissed that petition. Novicky's appeal from that decision was consolidated in the state system with his earlier appeal, *supra.*

The Illinois appellate court agreed with Novicky that the evidence given by Tsuetaki in the federal case (1) directly contradicted testimony relied upon by the state trial court in its resolution of the case and that (2) it established that Syntex was an indispensable party that should be joined in the state court action. It also held that the trial court had abused its discretion in dismissing Novicky's post-trial petition, vacated the trial court's judgment, and remanded the case for a new trial, directing that Syntex be joined.

On December 28, 1983, Tsuetaki filed a petition for rehearing, asking the Illinois

---

11. Before the trial on Syntex's trade secret claim, Syntex, pursuant to an agreement with Novicky, filed a Stipulation of Dismissal, dismissing without prejudice its patent infringement claims.

appellate court to vacate its decision and dismiss Novicky's appeal on the theory that Syntex's petition for removal to federal court, filed in July 1981, had divested the appellate court of jurisdiction. That petition for rehearing is still pending.

The litigation in federal District Court had continued throughout these post-trial events in state court. On May 6, 1982, the District Court granted Syntex a preliminary injunction (*Syntex Ophthalmics, Inc. v. Novicky,* 214 USPQ 272 (N.D.Ill.1982)), which was affirmed by the Seventh Circuit. *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 219 USPQ 962 (7th Cir.1983). The preliminary injunction enjoined Novicky and Tsuetaki from using the monomers and the processes in dispute.

Later, in October 1982, Novicky filed an amended answer and counterclaim against Syntex. The counterclaim charged Syntex with fraud, misrepresentation, and unjust enrichment for breaching its alleged agreement with Novicky to waive all interest in Novicky's December 1977 inventions (the '483 and '989 "private patents"). The District Court dismissed Novicky's counterclaim in November 1982, saying that Novicky was collaterally estopped by the state court's judgment (ordering Novicky to assign the '483 and '989 patents to Tsuetaki) from claiming unjust enrichment (on the basis of those patents) against Syntex.

In March 1983, before Syntex's case against Novicky and Tsuetaki went to trial, Syntex and Tsuetaki settled the controversy between them. Pursuant to that settlement, Syntex dropped its claims against Tsuetaki,[12] and Tsuetaki assigned to Syntex "all of ... [its] rights in the Novicky patents and patent applications relating to the ... [federal District Court action] and the State Court action between Tsuetaki/Fused [Kontacts] and Nick Novicky ...." On the basis of that assignment, combined with the "collateral estoppel effect of the state trial court judgment," the

District Court granted summary judgment on the patent title issue for Syntex. The District Court said that Tsuetaki owned all Novicky's patents and patent applications by virtue of the state court judgment; the settlement agreement then transferred Tsuetaki's rights in the patents and applications to Syntex. The District Court concluded, "[w]hatever Tsuetaki formerly owned, Syntex now owns."

In June 1983, the District Court held a bench trial on the trade secret misappropriation issue. Following that trial, the court held that Novicky had misappropriated Syntex's trade secrets and entered a final injunction enjoining Novicky for a twenty-year period from using Syntex's trade secrets.

## II

### Removal

■ We consider first the threshold issue of the removal of the state action to federal court pursuant to 28 U.S.C. § 1441 (the removal statute). We emphasize that, in our view, the only claim the District Court could remove from the state trial court was Count V of Tsuetaki's supplemental complaint, adding Syntex (post-judgment) as a party and seeking a declaratory judgment regarding the respective rights of Syntex, Tsuetaki, and Novicky in the property the state trial court had held belonged to Tsuetaki. The state trial court had already entered a final judgment on the other four counts, and Novicky filed a notice of appeal from that judgment three days before Syntex filed its petition to remove.

■ Under Illinois law, the jurisdiction of the reviewing court attaches *instanter* upon the timely filing of a notice of appeal. From then on, the lower court has no jurisdiction to modify its judgment or rule on matters of substance which are the subject of the appeal.[13] *City of Chicago v. Myers,*

---

**12.** As indicated in note *, *supra,* Tsuetaki has not participated at all in the current appeal.

**13.** A trial court may retain jurisdiction after a notice of appeal is filed for the limited purpose of ordering the repayment of attorney's fees and costs because that is a matter not affected by the

37 Ill.2d 470, 227 N.E.2d 760 (1967); *Montgomery Ward & Co. v. Wetzel*, 98 Ill. App.3d 243, 53 Ill.Dec. 366, 423 N.E.2d 1170, 1176 (1981). "[T]he cause is beyond the jurisdiction of the trial court." *City of Chicago v. Myers*, 227 N.E.2d at 761. Accordingly, at the time Syntex filed its petition to remove the action pending in the state trial court, the only claim still pending in that court was Tsuetaki's post-judgment addition to his complaint, Count V. Because the state trial court no longer had jurisdiction over Tsuetaki's original four claims, the federal court, which has only derivative jurisdiction on removal, also had no jurisdiction over those particular claims. *See Minnesota v. United States*, 305 U.S. 382, 389, 59 S.Ct. 292, 295, 83 L.Ed. 235 (1939).

■ The District Court's opinion (March 1982) denying Tsuetaki's motion for remand of the action to state court is consistent with this view that only Count V was in fact removed.[14] Plainly, the court held Count V against Syntex to be separate and independent, and it also noted that the state trial court's decision on Tsuetaki's original four counts was a final judgment and that Novicky had taken an appeal from it. It said (in discussing whether the joinder of Novicky in Count V was "fraudulent"):

> Tsuetaki has suggested ... that its claim against Novicky represents an actual controversy because Novicky is presently appealing the [state trial court's] ruling. The court does not agree .... [The] ruling [of the state trial court] amounts to an absolute declaration of Tsuetaki's and Novicky's rights with respect to the technology at issue in this case. Under Illinois law, the ruling is *res judicata* as to any further litigation of that claim

between the two notwithstanding the pendency of the appeal [citation omitted]. These comments support the view that only Count V was removed from the state court. If all the claims had been removed, including the four claims already decided, the District Court could not anticipate that the state appellate court would hear Novicky's appeal. Once a case is removed, the state court may proceed no further "unless and until the case is remanded." 28 U.S.C. § 1446(e). Any further proceedings in the state court subsequent to removal are *coram non judice* and will be vacated. 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 3737 (1976); *see Steamship Co. v. Tugman*, 106 U.S. (16 Otto) 118, 122, 1 S.Ct. 58, 60, 27 L.Ed. 87 (1882); *Kern v. Huidekoper*, 103 U.S. (13 Otto) 485, 493, 26 L.Ed. 354 (1880). In short, the only conclusion that harmonizes with all the circumstances is that Count V alone was removed. That count was indisputably removable at the time Syntex filed its removal petition (*see* 28 U.S.C. § 1441(c)) and Tsuetaki's early motion to remand was properly denied.

■ The District Court consolidated the removed claim with Syntex's original federal suit "for all purposes" in March 1983. Following the trial on Syntex's trade secret claim and the District Court's entry of the resulting order, Novicky filed a motion to remand the state action back to state court. We agree with the District Court that Novicky's motion to remand was filed too late. The section of the removal statute that gives the court the authority to remand, 28 U.S.C. § 1447(c), provides:

> If at any time *before final judgment* it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case ....

---

appeal or dependent upon the outcome of the suit. *Chicago Title & Trust Co. v. Czubak*, 67 Ill.App.3d 184, 23 Ill.Dec. 858, 384 N.E.2d 765 (1978). The lower court may also have jurisdiction to dismiss, under certain circumstances, the appeal of a party in the interim period between the filing of a notice of appeal and the docketing of the case by the reviewing court. *See Rickard v. Pozdal*, 31 Ill.App.3d 542, 334 N.E.2d 288, 291 (1975). Also, a trial court may

amend the record to correct "matters of inadvertence or mistake." *Arnold v. Leahy Home Building Co.*, 95 Ill.App.3d 501, 51 Ill.Dec. 285, 420 N.E.2d 699, 707 (1981).

**14.** Syntex's removal petition, though not absolutely precise, is likewise consistent with this view.

(Emphasis added.) Pursuant to that statute, the District Court could properly consider Novicky's motion to remand only if it were filed *before* final judgment. Novicky's motion, however, was filed after the court's entry of Syntex's voluntary dismissal of its claims against Tsuetaki and the court's entry of summary judgment on the patent claims. We agree with the District Court that these orders constituted a final judgment on the removed state court action. Novicky's motion to remand was correctly denied.

## III

### Patent Title

In its settlement agreement with Syntex, Tsuetaki assigned to Syntex "all of [its] ... right, title, and interest in and to United States Patent Nos. 4,216,303, 4,242,483, 4,248,989, 4,303,772, 4,314,068 [a division of the '303 patent, *supra* ] and 4,365,074 [another division of the '303 patent],[15] United States patent applications Serial Nos. 81,-682, filed October 4, 1979, and 103,408, filed December 19, 1979, and any patent(s) maturing therefrom ...." These patents and applications (except for the two divisionals of the '303 patent) are the ones which the state trial court ordered Novicky to assign to Tsuetaki in its January 1981 decision:

(1) Novicky is ordered to forthwith assign any and all interest he may have or claim to have in the following identified patent applications and patents to GEORGE TSUETAKI:

081682
072449 [U.S. Patent No. 4,303,772]
103408
06725 [U.S. Patent No. 4,216,303]
66054 [U.S. Patent No. 4,242,483]
74427 [U.S. Patent No. 4,248,989]

On the basis of collateral estoppel, the District Court granted summary judgment for Syntex on its title to the patents and applications which Tsuetaki had assigned to it.

■ Sometime after the District Court's grant of summary judgment, the state appellate court ordered that the state trial court's decision (on which the District Court had relied) should be set aside. However, as we show *infra*, the appellate court did not disturb the trial court's findings that Tsuetaki was the owner of U.S. Patent Nos. 4,216,303 and 4,303,772 and applications Serial Nos. 81,682 and 103,408. Accordingly, we hold that Novicky is still precluded from raising his claim to any of these four patents and applications, or his claim to the two divisionals of the '303 patent (U.S. Patent Nos. 4,314,068 and 4,365,074). We remand to the District Court the question of Syntex's title to the '483 and '989 patents (the "private patents"), because the appellate court did not accept the trial court's conclusion as to Tsuetaki's rights to those patents.

As already indicated in our discussion of removal in Part II, *supra*, the Illinois appellate court's jurisdiction over the trial court's decision was unaffected by the removal to District Court of the fifth count of Tsuetaki's complaint which added Syntex (post-judgment) as a party to the state litigation. The trial court's decision (and the trial which preceded it) was based on the original four counts to Tsuetaki's complaint and it was that decision which the Illinois appellate court reviewed.

■ The only real patent title dispute between Novicky and Tsuetaki in the original state court litigation concerned the two "private patents"—the '483 and '989 patents. With regard to the other four pat-

---

**15.** U.S. Patent Nos. 4,314,068 and 4,365,074 resulted from "divisional applications" filed by Novicky. A divisional application is defined in Section 201.06 of the Manual of Patent Examining Procedure as:

A later application for a distinct or independent invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application .... Both must be by the same applicant.

While a divisional application may depart from the phraseology used in the parent case there may be no departure therefrom in substance or variation in the disclosure that would amount to "new matter" if introduced by amendment into the parent case ....

ents and the applications at issue,[16] the trial court said that Novicky had "conceded that ... [the four patents and the applications] were duly assigned to GEORGE [Tsuetaki] in accordance with the employment agreement of August, 1978." The state appellate court accepted the trial court's conclusions with regard to those patents and applications. It observed that (1) when Novicky filed his first application, the 6,725 application (for the '303 patent), he had been paid $10,000 and was paid another $10,000 when the patent issued, in accordance with his agreement with Tsuetaki; (2) after the 6,725 application, Novicky filed two more applications, "which Novicky agrees belong to Tsuetaki" and; (3) that of the three additional applications filed, Novicky contends that only two of those three ("which he refers to as 'private patents' ") belong to him. These conclusions of the state appellate court, in effect affirming the state trial court on Tsuetaki's title, are entitled to preclusive effect. They meet all the requirements for application of the doctrine of claim preclusion or *res judicata.*[17]

■ Under the doctrine of *res judicata,* a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). *See also* 1B Moore's Federal Practice ¶ 0.405[1] (2d ed. 1983). In our case, the state trial court had held that Tsuetaki was the rightful owner of all of the patents and applications covered in the settlement agreement between Tsuetaki and Syntex.[18] The appellate court affirmed that judgment with regard to those patents and applications except for the "private patents". Novicky is thus barred from raising his claim to those patents and applications against Tsuetaki or against Syntex (which stands in Tsuetaki's place by virtue of the settlement agreement).[19]

It was title to the other two patents, the '989 and the '483 patents (the "private patents"), which was in true dispute in the state court litigation. Novicky's claim was that these patents were not covered by his employment agreement with Tsuetaki because Tsuetaki signed a statement in January 1980, in which he waived all rights to them under the employment agreement. The trial court said that Tsuetaki's waiver was ineffective because it was coerced, but

---

**16.** The two divisionals of the '303 patent were not explicitly mentioned in the state court opinion.

**17.** The doctrine of claim preclusion is more appropriate here than the doctrine of issue preclusion or collateral estoppel, cited by the District Court. The doctrine of issue preclusion normally comes into play to bar a party from retrying an issue that was actually litigated in a prior suit and was essential to the final judgment. *See Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569–70 (Fed.Cir. 1983); *International Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1090, 220 USPQ 1017, 1019 (Fed.Cir.1984). Here, it is the state trial court's final judgment itself and the appellate court's partial affirmance of it that are entitled to preclusive effect.

The fact that a petition for rehearing is pending in the state appellate court does not prevent that court's judgment from having preclusive effect. *See Sixty-Third & Halsted Realty Co. v. Goldblatt Bros.,* 342 Ill.App. 389, 96 N.E.2d 838, 843, *aff'd,* 410 Ill. 468, 102 N.E.2d 749 (1951). ("The law is clearly established that a judgment and decree pending on appeal is *res judicata.*")

**18.** Although the state trial court did not explicitly discuss the two divisionals of the '303 patent, its order that Novicky assign the '303 patent to Tsuetaki necessarily included the two divisionals because they are, by definition, "carved out of" the parent patent. *See supra,* note 15.

**19.** The state appellate court vacated and reversed the state trial court's judgment, remanding for a new trial, but that was based on three grounds now irrelevant, and had no effect on the patent title matters which we have just discussed. The first ground of reversal was that Novicky had stated a *prima facie* case of fraud against Tsuetaki (with respect to the "private patents", discussed *supra* ) under the special Illinois post-trial procedure. The second ground was that Syntex was an indispensable party to the state litigation—a ground now obviously inapplicable to conclusions as to preclusive effect in Syntex's favor. The third ground was that the state court injunction against Novicky was too long, too broad, and too general. That, too, is irrelevant to the present issue of patent title.

the appellate court remanded on that precise issue, because of Tsuetaki's apparently contrary evidence in the federal litigation. *See* Part I, B, *supra.*

Syntex asks that this court affirm the District Court's grant of summary judgment on Syntex's title to these two patents despite the state appellate court's order for remand. This request is based on alleged "independent documentary proof of Syntex's title." Syntex points out that Novicky admitted that he invented the subject matter of these patents while working for Syntex [20] and it was the subject of his December 15, 1977 patent disclosure witnessed by two Syntex employees. However, Novicky has alleged in a counterclaim for fraud and unjust enrichment dismissed by the District Court (on grounds of collateral estoppel) that Syntex waived any ownership rights it might have in these patents. According to Novicky, Courtland Spicer, a Syntex vice president, told him that "Arapahoe [Syntex] had no interest in the subject matter of Novicky's 1977 inventions and that Novicky was free to develop such inventions in his own name and as his own property." This explicit but unexamined allegation of a significant statement by a Syntex agent (admissible under Federal Rules of Evidence 801(d)(2)(D)) warrants further inquiry, and we therefore return this matter to the District Court for trial or further proceedings.

### IV

### Misappropriation of Trade Secrets

■ The District Court found that Syntex met its burden on each of the four factors necessary to prove misappropriation of trade secrets under Illinois law (the applicable state law in this case).[21] According to the District Court, Syntex established (1) that it had legally cognizable trade secrets, (2) that Novicky obtained the trade secrets within a confidential relationship with Syntex, (3) that Novicky disclosed the secrets in breach of the confidential relationship, and (4) that Novicky profited from the disclosure.[22] *See Schulenburg v. Signatrol, Inc.,* 50 Ill.App.2d 402, 200 N.E.2d 615 (1964), *aff'd in part and rev'd in part,* 33 Ill.2d 379, 212 N.E.2d 865 (1965), *cert. denied,* 383 U.S. 959, 86 S.Ct. 1225, 16 L.Ed.2d 302 (1966). On the record before us, we cannot say that these findings were clearly erroneous. *See Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1544 n. 4, 221 USPQ 1, 5 n. 4 (Fed.Cir.1984); *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir.1983).

■ A. *Existence of trade secrets:* Illinois courts define a trade secret as "a secret plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it." *Schulenburg v. Signatrol, Inc.,* 212 N.E.2d at 868 (emphasis omitted); *Bimba Mfg. Co. v. Starz Cylinder Co.,* 119 Ill.App.2d 251, 256 N.E.2d 357, 363 (1969); *Colony Corp. of America v. Crown Glass Corp.,* 102 Ill.App.3d 647, 58 Ill.Dec. 283, 285, 430 N.E.2d 225, 227 (1981). The set of processes and ingredients used in the manufacture of Polycon, as disclosed in the batch sheets and the

---

**20.** We are aware that Novicky admitted this fact as a *pro se* litigant, but attach no significance to that because what he admitted is a simple statement of fact, within Novicky's knowledge, and calling for no legal conclusion. We are more willing to discount Novicky's admissions that the patents "belong" to Syntex or that Syntex has "rights" in them because those admissions are legal conclusions and because Novicky withdrew those concessions after he hired counsel.

**21.** A federal District Court must apply the conflict of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The

applicable Illinois rule is that in an action based upon alleged misappropriation of proprietary information or trade secrets, the law of the place where the alleged wrong was committed or the benefit was obtained by the defendant should govern. *Smith v. Dravo Corp.,* 203 F.2d 369, 373, 97 USPQ 98, 101 (7th Cir.1953). Here, Illinois law is applicable because the alleged wrong took place at Tsuetaki's place of business in Illinois.

**22.** The parties agreed before trial that Syntex did not have to introduce evidence to prove this fourth element.

FDA file, fit this definition. First, by its terms, the definition provides that a process can be a trade secret. *See also Imperial Chemical Industries, Ltd. v. National Distillers & Chemical Corp.*, 342 F.2d 737, 742–43, 144 USPQ 695, 698–99 (2d Cir.1965) (trade secret in process for constructing an autoclave reactor); *Ferroline Corp. v. General Aniline & Film Corp.*, 207 F.2d 912, 921, 99 USPQ 240, 246 (7th Cir.1953), *cert. denied*, 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954) (trade secret in process for production of iron pentacarbonyl). Second, it is clear that Syntex made great efforts to keep its Polycon process secret. The District Court found:

> [Syntex] ... restricted access to [its] ... Research and Development Department to only those employees and consultants ... who had signed secrecy agreements. Laboratory notebooks and batch records were under lock and key. Only those who needed information in confidential reports received them. The building housing the POLYCON laboratory remained locked after business hours. Visitors had to register and employees accompanied them during their visit. While orienting new employees, [Syntex's] ... personnel department specifically reviewed ... paragraphs three and four of the employment agreement which established the duty not to disclose confidential information [see Novicky's employment agreement with Syntex, *supra*, Part I]. At orientation, employees also learned that everything they did or learned was secret and subject to that duty. Dr. Courtland Spicer, a supervisor on the project, told his employees that the information in the batch sheets was valuable and confidential. Syntex never published the batch sheets or the analytical methods [contained in the FDA master file].

We agree with the District Court that manufacturing process details which are given such confidential treatment are entitled to protection as trade secrets. *See Affiliated Hospital Products, Inc. v. Baldwin*, 57 Ill.App.3d 800, 15 Ill.Dec. 528, 530, 373 N.E.2d 1000, 1002, 1006, 202 USPQ 220, 221–22, 225 (1978).

■ Novicky argues, nonetheless, that the Polycon process is not a trade secret. He asserts that the "batch sheets ... are nothing more than a compilation of reactions, each of which is well-known to the art and documented in the literature." Novicky fails to acknowledge that it is this very "compilation of reactions"—along with information about the ingredients and procedures used in them—that is the trade secret. Even if Novicky were correct in his assertion that all the reactions used in the Polycon process were individually well-known in the art, that would not preclude the existence of a trade secret in the *compilation* of processes:

> [A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

*Imperial Chemical Industries*, 342 F.2d at 742 (citations omitted). *See also Ferroline Corp.*, 207 F.2d at 921 ("process as a *whole* ... differ[ed] materially from any methods taught in the prior art") (emphasis added). As the District Court said: "the value of the secret to Syntex lay in the *accumulation and integration of the various basic steps* into a commercially feasible product" (emphasis added). Novicky admitted at the trial before the District Court that no single public domain document sets forth all the details contained in Syntex's batch sheets or FDA master file.

■ B. *Novicky's Access to the Trade Secrets:* Novicky admitted at trial that he had access to any documents he wanted relating to the Polycon project. This would include the batch sheets, much of which he developed himself, and the FDA master file. The employment agreement he signed with its non-disclosure and assignment clauses (*see supra*, Part I) demonstrates that he received the trade secrets in the context of a confidential relationship.

■ C. *Novicky's Disclosure of the Trade Secrets:* The District Court cited the testimony of Dr. McGrath (Syntex's expert) who stated that the crucial portions of the Tsuetaki and Syntex batch sheets were identical and of Mr. Merker (Novicky's expert) who said (confused as to which set of batch sheets he was holding) that the materials "both look[ed] alike" to him. The court also noted that Dr. McGrath had pointed out errors which appeared in both the Arapahoe and Tsuetaki batch sheets which he labelled "fingerprint errors" because they were mistakes that a chemist was unlikely to repeat, unless he was copying directly from a document. McGrath likewise testified that the specifications and analytical methods contained in the FDA master file Novicky prepared for Tsuetaki were "very very similar" to and contained "an awful lot of very nearly identical materials" to those in the Syntex FDA master file. He said: "[T]he chemical procedures, the data sheets, even some of the log sheets are almost identical. There is no difference between several of these. Even the typing is the same." Given this evidence of the similarities between the two sets of process sheets, we cannot find that the District Court's conclusion, that Novicky copied Syntex's process sheets and used its trade secrets at Tsuetaki's plant, is clearly erroneous.

## V

### The Remedy

■ The District Court's final injunction provided in its most significant part:

Novicky and [his agents] are ... enjoined for twenty (20) years from May 12, 1978 [the day Novicky resigned from Syntex], or until May 12, 1998, from using or

disclosing information found in the Arapahoe [Syntex] batch sheets and the FDA Master File, and not found in public domain documents, for manufacture of silicone-containing, rigid, gaspermeable contact lens materials....

Novicky challenges both the scope and duration of the injunction. Under Illinois law, an injunction in a trade secret case must be limited to the approximate length of time necessary for the defendant to duplicate the trade secret by lawful means. *Brunswick Corp. v. Outboard Marine Corp.*, 79 Ill.2d 475, 38 Ill.Dec. 781, 783, 404 N.E.2d 205, 207 USPQ 1039 (1980); *Schulenburg v. Signatrol, Inc.*, 212 N.E.2d at 869–70.[23]

■ On this issue, there were three separate pieces of evidence before the District Court. Novicky's expert, Mr. Merker, testified as follows (on cross-examination) on the question of the time necessary for independent development:

SYNTEX ATTORNEY (MR. GOULD): Do you have any opinion how long it would take someone starting with the Gaylord patent and the other public documents you talked about to come up with those procedures for an optimized process?

MR. MERKER: To the final product?

MR. GOULD: The final product optimized process, all those specifications and all those analytic methods.

\* \* \* \* \* \*

MR. MERKER: From start to finish, if you lump everything together, the last step takes the longest. I would estimate maybe a year.[24]

Dr. McGrath's (Syntex's expert's) corresponding testimony (on direct examination) went as follows:

---

23. Many other jurisdictions have used this "independent development test." *See, e.g., K–2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 474, 183 USPQ 724, 726 (9th Cir.1974); *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 431, 205 USPQ 723, 741 (E.D.Pa.1980); *Sperry Rand Corp. v. Electronic Concepts, Inc.*, 325 F.Supp. 1209, 1219 (E.D.Va.1970), *vacated and remanded on other grounds*, 447 F.2d 1387 (4th Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d

479 (1972). *See also* 12 R. Milgrim, Trade Secrets § 7.08[1] n. 12 (1983).

24. Mr. Gould's follow-up question makes it clear that Merker was testifying with regard to the length of time it would take to develop procedures for an optimized *commercial* (rather than a laboratory) process. He asked Mr. Merker, "But you have never actually done a scale-up yourself to a commercial process, have you?"

MR. GOULD: Those time intervals that you set [much less than a year], were those for making a laboratory scale or were they for making an industrial-commercial scale usable for contact lenses as set forth in the batch sheets?

DR. McGRATH: I was thinking about a laboratory scale to make a sample or two.

MR. GOULD: How long would it take to develop for you, if you were given nothing but the Gaylord patent, to develop the specification, analytic techniques, and the batch sheets, given just the Gaylord patent?

DR. McGRATH: It would take an enormously longer period of time, certainly months, maybe years.

The District Court discounted both Merker's and McGrath's testimony [25] and relied almost entirely on the testimony of Dr. Capozza, President of Syntex Ophthalmics, that "in excess of 20 man-years and in excess of one million dollars was spent in developing the process." The choice of a 20-year period for the final injunction was squarely rested on this evidence. We think that this was clear error and an abuse of discretion. The fact that Syntex may have spent 20 man-years (involving quite a number of people) and a million dollars on the development process does not mean that Novicky would take 20 years to recreate independently the trade secrets. Dr. Capozza himself testified that the actual elapsed time was some *"two years* of effort ... from the early '77 period to the point at which the product was introduced into the market in May of '79" (emphasis added). Particularly in view of this limited actual time-span, there are several defects in measuring the duration of the injunction by the number of *man-years* Syntex's employees spent during that two years. For one thing, Syntex may well not have need-

ed all those man-hours merely to develop the particular trade secrets (mainly the batch sheets and FDA file) that Novicky misappropriated; there is good reason to believe that Dr. Capozza's estimate included much else leading to the commercialization of the product.[26] Then, too, Syntex may have expended far more effort than actually necessary even to produce the particular trade secrets; it is not unknown for people to be more careful and thorough than actually necessary. Moreover, it seems strange to enjoin appellant for 20 years (until May 12, 1998) because Syntex expended 20 man-years (using several people) in an actual two-year span, and at the same time to enjoin appellant (as the final injunction appears to do) from utilizing any agents, servants, or employees or any other persons in concert with him. In other words, appellant is enjoined from acting either alone or with others for 20 years, on the basis of Syntex's use of others (during an actual two-year period) to the extent of 20 man-years. Even if Novicky were willing and able to expend, along with others, the same two years and the 20 man-years of effort to develop independently the matters which he misappropriated, he would apparently still be barred until 1998.

■ An injunction was plainly warranted but our conclusion, on this record, is that it was clear error and an abuse of discretion to extend the injunction for 20 years until 1998. This error is important because extending the injunction beyond the time Novicky could independently have developed the Polycon procedures would give to Syntex "a windfall protection and would subvert the public interest in fostering competition and in allowing employees to make full use of their knowledge and ability." *Brunswick Corp. v. Outboard Marine Corp.*, 404 N.E.2d at 207.[27]

---

**25.** The court was wrong in finding that the two experts' testimony related "to the mere laboratory production of a polymer." As shown *supra,* this testimony went much further.

**26.** Dr. Capozza agreed that his estimate includes things involved "directly or indirectly" in the whole process development. Of course, the

time spent on Syntex's efforts aside from the development of the purloined trade secrets must be excluded.

**27.** An employee can always take with him, at the termination of his employment, the general skills and knowledge gained while working for

The issue then becomes whether we should simply remand to the District Court to exercise its judgment properly, or whether we can set durational limits. We believe that, on the whole record, the *maximum* duration this record will permit is eight years from May 1978 (when Novicky left Syntex's employ) or four years from the date of the District Court's preliminary injunction (May 1982).[28]

Since somewhat less than two years remain of the maximum span of the injunction the District Court can enter, we proceed to discuss Novicky's further claim that the injunction is too broad in scope. First, the injunction should be modified, to the necessary extent (if any), to accord with the court's determination (on remand) of the ownership of the "private patents". Second, the very general term "not found in public domain documents" needs clarification and specification. Third, because the misappropriated trade secrets consist of a compilation of reactions (*see* Part IV, *supra*) not of the individual reactions singly, the second and last paragraphs of the injunction should be modified to assure that appellant will not be in contempt merely through use of already known individual reactions or ingredients.

## VI

### Conclusion

We affirm the District Court's grant of summary judgment for Syntex on its title to the patents and applications covered by the settlement agreement with Tsuetaki, except for the '483 and '989 patents. We remand to the District Court the question of Syntex's title to the latter patents and reverse the court's dismissal of Novicky's counterclaim for fraud and unjust enrichment regarding them. We affirm the District Court's judgment that Novicky misappropriated Syntex's trade secrets, but reverse the final injunction and remand for further consideration of the duration and terms of the injunction in accordance with

this opinion. We affirm the denial of Novicky's motion to remand the state action back to the state court.

*Affirmed in part, Modified in part, Reversed in part, and Remanded.*

---

an employer. *Schulenburg v. Signatrol, Inc.,* 212 N.E.2d at 869.

**28.** Novicky was placed under the similar state court injunction in January 1981.