ROTON BARRIER, INC. and Austin R. Baer, Plaintiffs–Appellees,

v.

The STANLEY WORKS, Defendant–Appellant.

No. 95–1217.

United States Court of Appeals, Federal Circuit.

March 4, 1996.

Rehearing Denied April 22, 1996.

Lawrence G. Kurland, Bryan Cave LLP, New York City, argued for plaintiffs-appellees. With him on the brief were Thomas C. Walsh and David A. Roodman, St. Louis, Missouri; Veryl L. Riddle, Bryan Cave LLP, of St. Louis, Missouri, of counsel.

Stephen M. Axinn, Skadden, Arps, Slate, Meagher & Flom, New York City, argued for defendant-appellant. With him on the brief was Constance S. Huttner. Also on the brief were James D. Veltrop, Washington, DC, and Peter Costas, Pepe & Hazard, Hartford, Connecticut, of counsel.

Before RICH, Circuit Judge, NIES, Senior Circuit Judge,* and PLAGER, Circuit Judge.

Opinion for the court filed by Circuit Judge RICH. Additional views filed by Senior Circuit Judge NIES.

RICH, Circuit Judge.

The Stanley Works (Stanley) appeals from the judgment of the United States District Court for the Eastern District of Missouri finding trade secret misappropriation under the law of Illinois and awarding actual and exemplary damages therefor, finding willful infringement of U.S. Patent No. 4,976,008 (the '008 patent) and awarding actual and treble damages therefor, finding the invention claimed in the '008 patent to have been nonobvious, awarding prejudgment interest and attorney fees, and enjoining Stanley from disclosing any of Roton's trade secret information and from participating or otherwise engaging in the continuous pinless hinge

---

* Judge Nies assumed senior status on November 1, 1995.

business for four years from the date of the judgment. *Roton Barrier, Inc. v. The Stanley Works,* No. 4:92–CV–709–CAS (E.D.Mo. January 27, 1995).

As to the trade secret claim, we affirm the holding of trade secret misappropriation, affirm the award of actual damages, reverse the award of exemplary damages, and vacate the award of attorney fees and the injunctive relief. As to the patent claim, we reverse the holding of infringement, vacate the finding of willfulness, the award of attorney fees and the award of injunctive relief, and affirm the holding as to validity. We affirm the award of prejudgment interest. We also remand for determinations consistent with this opinion.

## I. BACKGROUND

### A. The Technology

In 1963, Austin R. Baer (Baer), the owner of Roton Corporation, a predecessor in interest to appellee Roton Barrier, Inc. (Roton) [1], obtained U.S. Patent No. 3,092,870 directed to a hinge comprising two intermeshed geared hinge members, a so-called continuous pinless hinge. In 1968, Baer obtained another patent, U.S. Patent No. 3,402,422, directed to an improvement in pinless hinges in which thrust bearings are placed in recesses along the length of the hinge leaves. In 1990, Baer secured yet another patent, the '008 patent in suit, which discloses adding bearing inserts above and below each thrust bearing "for enhancing hinge performance by reducing frictional sliding contact between the hinge members" and each thrust bearing. Through the course of the years, Baer developed and refined his process for manufacturing Roton hinges and Roton became the market leader in continuous pinless hinges.

### B. Contact Between Stanley and Roton

As early as 1976, Stanley was interested in manufacturing Roton-type hinges. Stanley concluded, however, that "[a]s a product, the Roton hinge does not lend itself to Stanley manufacturing capabilities" and "is limited to

an extruded process requiring extremely close tolerances." In 1988, Stanley was again interested in "adding a commercial continuous hinge as a product line." At that time, Stanley estimated that "95% of all commercial continuous hinge applications are Roton" hinges.

In 1989, Stanley considered acquiring Roton. Stanley's Vice President of Marketing (Bannell) first contacted Baer and in April 1989, Roton and Stanley entered into a Confidentiality Agreement which barred the disclosure or use by Stanley of any of the "Evaluation Material" provided to it by Roton except for purposes of Stanley's evaluation of Roton for acquisition. In June of that year, Stanley's Vice President of Manufacturing (Martino), Comptroller (Gallagher), and President (Martin) inspected the Roton facility. Gallagher and Martin also reviewed Roton's financial statements and discussed the information with Roton's accountant. Various conferences took place between Stanley and Roton and there was what can be characterized as a free flow of information from Roton to Stanley seemingly concerning every aspect of Roton's business.

In July 1989, Stanley made an offer to purchase Roton, which Roton rejected. On August 1, Roton terminated negotiations with Stanley and requested the return or destruction of all confidential materials. Later that month, Stanley corresponded with Roton about a possible distributorship arrangement. During these negotiations Stanley sought to amend the Confidentiality Agreement to provide:

> Notwithstanding anything to the contrary contained in this Agreement or the April 10, 1989 [Confidentiality Agreement], Stanley specifically represents to Roton that Stanley currently possesses the capability of manufacturing and selling continuous hinges for use on architectural/commercial grade exterior and interior doors. This capability was developed independently by Stanley without use of any Evaluation Material.

---

1. For simplicity, Roton Corporation and Roton Barrier will both be referred to as Roton in this opinion.

Baer found this proposed amendment inconsistent with his understanding of Stanley's capabilities prior to its evaluation of Roton and for this reason broke off all discussions with Stanley.

In January 1990, Roton was acquired by C. Hager & Sons Hinge Manufacturing Co. (Hager), a chief competitor of Stanley, and became Roton Barrier. When Stanley learned of Hager's acquisition of Roton, it embarked on a self-styled "aggressive project plan" in which it sought to "develop [its] own product line of continuous extruded hinges." In response to perceived "weaknesses in the life cycle of the Roton product," Stanley intended to "focus on an improved weight bearing system." As a result, Stanley introduced into the market its own continuous pinless hinge, the LS500.

### C. District Court Proceedings

Roton sued Stanley for patent infringement, misappropriation of trade secrets, and breach of contract. Stanley counterclaimed seeking a declaratory judgment of patent invalidity, and unenforceability and noninfringement. The suit was tried in the district court without a jury. The court found misappropriation of trade secrets and awarded $2,791,677 in actual damages and the same amount in exemplary damages. The trial court found patent infringement under the doctrine of equivalents and awarded $129,030 in actual damages which it trebled after finding the infringement to be willful. The total damages award was $5,970,444. Attorney fees were also awarded as was prejudgment interest on the actual damages portion of the award from June 1, 1991. Additionally, Stanley was barred from participating in the continuous pinless hinge business for four years from the date of the judgment and was also permanently enjoined from using, disclosing, or otherwise disseminating any of Roton's trade secrets.

We have jurisdiction under 28 U.S.C. 1295(a)(1) (1994), including pendent jurisdiction to consider the counts of trade secret misappropriation and breach of contract. *Rhone–Poulenc Specialites Chimiques v. SCM Corp.,* 769 F.2d 1569, 1571, 226 USPQ 873, 874 (Fed.Cir.1985).

## II. *TRADE SECRET MISAPPROPRIATION*

### A. *Heightened Scrutiny*

■ Stanley first contends that the trial court's decision should be reviewed by us with heightened scrutiny because the trial court "largely copied its trade secrets decision verbatim from plaintiffs' post-trial pleadings."

■ It is acceptable for a trial court to adopt "many or most of the parties' proposed findings of fact and conclusions of law, particularly if skillfully and wisely drafted." *Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 23, 23 USPQ2d 1663, 1676 (7th Cir.1992). Moreover, that the district court adopted many of Roton's proposed findings does not alter our basic standard of review.

### B. *Trade Secret Law*

■ Federal courts apply the trade secret law of the appropriate state. *See Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 670, 7 USPQ2d 1097, 1105 (Fed.Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). In the case at bar, we apply the trade secret law of the State of Illinois. This case is governed by the Illinois Trade Secrets Act, enacted in 1988. 765 ILCS § 1065 (West 1995) (formerly Ill.Rev. Stat.1991, ch. 140, par. 351–59) (ITSA).

### C. *Roton's Trade Secrets*

The first step in any trade secret analysis is a determination of whether any trade secrets exist.

#### 1. *The law*

Section 2 of ITSA provides that:

(d) 'Trade secret' means information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not

being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS § 1065/2(d) (West 1995).

"The focus of both the common law and [ITSA] is on the secrecy of the information sought to be protected." *Service Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 129 Ill.Dec. 367, 371, 535 N.E.2d 1132, 1136, 11 USPQ2d 1062, 1065 (1989). "[T]he key to 'secrecy' is the ease with which information can be developed through proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret." *Hamer Holding Group, Inc. v. Elmore*, 202 Ill.App.3d 994, 148 Ill.Dec. 310, 321, 560 N.E.2d 907, 918 (1990) (appeal denied).

Section 2(d)(2) of ITSA essentially parallels the common law factors used in determining whether information is a trade secret, which include:

(1) the extent to which the information is known outside the employer's business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and his or her competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Stampede Tool Warehouse, Inc. v. May*, 272 Ill.App.3d 580, 209 Ill.Dec. 281, 287–88, 651 N.E.2d 209, 215–16, 35 USPQ2d 1134, 1138 (1995) (appeal denied).

### 2. *The trial court*

The trial court found nine areas of trade secrets: Roton's gross margins, sales data, market analysis information, hinge profile sales data, customer lists, milling process, lubrication information, machine and hinge fixturing methods, and capitalization requirements.

Regarding the economic value of the information, a requirement of section 2(d)(1), the trial court opined that:

[the trade secret] information would have been of great value to Mr. Baer's competitors in the hinge business. Mr. Baer expended very significant effort, time and money to develop this information. It was of a nature that could not easily be acquired or correctly duplicated by others.

As to the maintenance of secrecy of the trade secrets, under section 2(d)(2), the trial court stated that:

this information was not known outside of Roton, and was to a large extent known within Roton only by Mr. Baer. Mr. Baer did not otherwise share this information with others.

### 3. *Analysis*

On appeal, Stanley contends that Roton was "unable directly to prove misappropriation of any specific trade secret" and instead improperly relied on a "head start" theory in which unspecified trade secret information was given to Stanley affording it a head start in developing a continuous pinless hinge. It is true that "[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265, 22 USPQ2d 1568, 1570 (7th Cir. 1992). Contrary to Stanley's assertion, however, we agree with the trial court's finding that Roton had specific trade secret information.

For instance, Baer testified that during the course of developing continuous pinless hinges, he developed a proprietary milling process using a horizontal milling cutter in which small cutouts can be made, thereby allowing construction of small hinges and in which a single machine can be used to machine hundreds of hinge profiles. The horizontal milling cutter was designed and built by Baer himself, who had upwards of 30 years experience in the business.

Baer also testified that Roton had a proprietary lubrication mixture "formulated over the years." Specifically, Roton used a dry

lubricant, the use of which "wasn't obvious and can't be obvious from examination of the hinge." Additionally, Baer testified that Roton designed its own dies and maintained their confidentiality.

As for financial information, Baer testified that Roton had "balance sheets, income statements, and financial statements ... and income tax returns of the Roton Corporation for several years" which were considered confidential. Additionally, Roton's gross margins were confidential.

We agree with the trial court that Roton's specific trade secrets were maintained in confidence. The information was not known outside of Roton's business and much of it was only known by Baer. Baer took reasonable measures to guard the secrecy of the information. In this regard, the trial court specifically found that though others may have visited the Roton facility, "these visits were cursory and casual, and these persons were not shown and did not see confidential or trade secret information." This finding is not clearly erroneous.

Additionally, Roton's trade secret information was quite valuable. Indeed, it was the cumulative knowledge of 30 years in the business as the pioneer of continuous pinless hinges. We accordingly affirm the trial court's finding that under ITSA, Roton had protectable trade secrets.

D. *Misappropriation of Roton's Trade Secrets*

■ We next consider whether there was misappropriation of any of Roton's trade secrets. The ITSA provides that:

(b) 'Misappropriation' means:

 \* \* \* \* \* \*

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

 \* \* \* \* \* \*

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

 \* \* \* \* \* \*

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

765 ILCS § 1065/2 (West 1995).

The negotiations between Stanley and Roton were framed against the backdrop of the Confidentiality Agreement which barred Stanley from using or disclosing any of the Evaluation Material, defined as all information furnished to Stanley except that which:

(1) becomes generally available to the public other than as a result of a disclosure by Stanley or its representatives; (2) was available to Stanley on a nonconfidential basis from a source other than Roton ...; or (3) becomes available to Stanley from a source other than Roton.

As a result of the Confidentiality Agreement, any trade secrets were acquired by Stanley under circumstances giving rise to a duty to maintain its secrecy or limit its use as set forth in section 2(b)(2)(B)(II) of ITSA.

During the negotiations, the trade secrets were disclosed to Stanley. Stanley representatives went on two separate tours of Roton's facilities and during those tours Roton's processes were demonstrated to the Stanley personnel by Baer himself. During these tours, too, financial information was discussed. Additionally, the record amply demonstrates that there was a relatively free-flow of information from Roton to Stanley. For instance, Stanley requested and received answers in 22 different areas. These questions indicate the breadth and detail of information requested by Stanley and provided by Roton. In addition, Baer testified that he answered any questions that Stanley had because he "had some interest in making sure they [Stanley] understood the value of what they were looking at."

It is abundantly clear from the record that parties at Stanley instrumental in reviewing Roton's manufacturing facilities and financial data were the same people placed in charge of developing the LS500. Stanley admitted as much. Pursuant to a Stanley interoffice memo dated March 12, 1990, Bannell was to issue a market research report and Martino was to "start evaluating custom machining

and cell design for milling, drilling, punching, and countersinking."

Additionally, in response to interrogatories, Stanley admitted that Martin was given the "overall goal to develop, design and manufacture a superior ... continuous hinge." Bannell "guided the product development efforts from the marketing standpoint, including market research, sales input, pricing, advertising and catalogs." Martino was responsible for directing the "manufacturing and purchasing activities for the project." Thus, individuals at Stanley, who knew they were bound by the Confidentiality Agreement, knew they were disclosing and using Roton's trade secret information for the development of the LS500. We agree with the trial court that the requirements of section 2(b) of ITSA are met.

Stanley's assertion that these people were mere figureheads and that their subordinates were really responsible for the LS500 project is disingenuous at best. This is especially true with respect to Martino who admittedly spoke directly to Kon and gave him the details of the Roton plant tour. Martino testified that he had conversations with Kon about the "kind of coating [Roton] used to lubricate the hinge" and that he acquired this information "from the plant visit." Martino further testified that he "basically described to [Kon] how the hinge was made" based on the plant tour.

On appeal, Stanley contends that Roton's "entire case regarding manufacturing trade secrets fails because ... a third party, Linn, through his company Select, manufactured Stanley's hinge using its own process." However, the trial court's finding that trade secret knowledge acquired from Roton was used by Stanley to instruct Linn is not clearly erroneous. Indeed, it was only after Kon visited Linn that Linn's company, Select, was able to make satisfactory Roton-type hinges. This certainly supports a conclusion that Stanley provided Linn with Roton's trade secret information.

Taking a broader view, we note that it is quite telling that as early as 1976 Stanley had determined that it could not manufacture Roton-type hinges because such manufacture required tolerances not achievable by Stan-

ley. Yet after twice touring Roton's facility and being privy to virtually all of Roton's technical and financial information, Stanley was able to quickly design, have manufactured and market its own continuous pinless hinge.

Moreover, it is undisputed that Baer has been in the continuous pinless hinge business for upwards of 30 years. Baer developed the hinge and the processes used to make the hinge. Baer designed and built virtually all the machinery for making the hinges. Baer also developed a market for the hinge. When Stanley came along, Baer essentially opened his doors and gave Stanley any and all of the proprietary information cultivated during that 30 year period. After receiving all this information in the context of the Confidentiality Agreement, Stanley then asserted that it had the capability of making Roton-type hinges from independently gained knowledge. Such an assertion coupled with Stanley's repeated assertions during the negotiations that Stanley did not have the capability to manufacture Roton-type hinges and had no interest in developing such a hinge on its own also support a finding of trade secret misappropriation.

Based on the totality of the record, we affirm the trial court's finding of trade secret misappropriation.

### E. Actual Damages for Trade Secret Misappropriation

■ Section 4(a) of ITSA provides that:

a person is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

765 ILCS § 1065/4(a) (West 1995).

"A trial judge's assessment of damages 'will not be set aside unless it is manifestly erroneous.'" *Levy v. Markal Sales Corp.,* 268 Ill.App.3d 355, 205 Ill.Dec. 599, 612, 643 N.E.2d 1206, 1219 (1994) (appeal denied) (citations omitted). "[A] party seeking damages must supply a reasonable basis for the computation of those damages." *Id.* 205 Ill.

Dec. at 612, 643 N.E.2d at 1219 (citations omitted).

The trial court found that the "actual damages plaintiffs have sustained include both lost sales and price erosion." The price erosion damages included historical price erosion and future price erosion.

Stanley contends that the trial court failed to "separate the damages that resulted from the lawful entry of a powerful competitor ... from damages that resulted from particular forms of misconduct." We find this not to be the case; in fact it is unclear that Stanley would have entered the market at all absent Roton's trade secret information. Indeed Stanley had considered such entry before, but had rejected it. Here it appears that though Stanley was motivated by competition with Hager, it was armed with Roton's proprietary information when it embarked on its aggressive project plan.

From our review of the record, we conclude that the trial court's assessment of damages was not manifestly erroneous. The record amply supports the award of lost profits owing to Roton's loss of market share attributable to Stanley's entry in the market.

The record also supports the award of historical price erosion damages. Roton reduced its prices in response to Stanley's entry in the market. Though there were others in the market, Zero and Pemko, with lower prices, Roton perceived their products to be inferior and saw no need to lower its prices in response to their entry.

Finally, respecting the award of future price erosion damages, Baer testified that a substantial period of time will be required for Roton to reestablish its prices and margins. No evidence requires rejection of this testimony. We affirm the trial court's award of actual damages for trade secret misappropriation.

## F. *Exemplary Damages*

■ Section 4(b) of ITSA provides that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)." 765 ILCS § 1065/4(b) (West 1995).

■ "Whether to award punitive damages is an issue for the sound discretion of the trial court, and its decision will not be set aside absent an abuse of discretion." *Obermaier v. Obermaier*, 128 Ill.App.3d 602, 83 Ill.Dec. 627, 633, 470 N.E.2d 1047, 1053 (1984) (appealed denied). However, "punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Levy*, 205 Ill.Dec. at 616, 643 N.E.2d at 1223 (citations omitted). Additionally, punitive damages are penal in nature and their "purpose is to deter the defendant and others from committing the same offense in the future." Such damages should be "allowed with caution and confined within narrow limits." *Embassy/Main Auto Leasing Co. v. C.A.R. Leasing, Inc.*, 155 Ill. App.3d 427, 108 Ill.Dec. 170, 173–74, 508 N.E.2d 331, 334–35 (1987) (appeal denied).

Under ITSA, in order for there to be misappropriation, there must be knowing disclosure of a trade secret. By its very terms, therefore, trade secret misappropriation under ITSA requires a "bad act": the disclosure of someone else's trade secret. For an award of exemplary damages, that misappropriation must in addition be willful *and* malicious. In this regard, the trial court stated only that "Stanley's misappropriation was willful and malicious." From our review of the record, such a finding is not legally supportable.

Illinois courts have distinguished between motivation by malice and motivation by competition and have awarded punitive damages in the former situation, but not in the latter. *Embassy/Main*, 108 Ill.Dec. at 174, 508 N.E.2d at 335 (citing *Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 51 Ill.App.3d 38, 9 Ill.Dec. 62, 366 N.E.2d 319 (1977)).

In this case, it is clear that Stanley was motivated by competition when it embarked on its aggressive project plan to enter the continuous pinless hinge market. One of its biggest rivals, Hager, had just acquired Roton, and Stanley sought to compete. Other courts have recognized that competition by its very nature "is ruthless, unprincipled, uncharitable, unforgiving—and a boon to soci-

ety." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1268, 22 USPQ2d 1568, 1572 (7th Cir.1992).

Because Stanley was motivated by competition with its biggest rival, rather than by any malice against either Hager or Roton, we conclude that the trial court's award of exemplary damages was an abuse of discretion. By our decision we certainly do not condone the actions of Stanley in its dealings with Roton. Indeed, Stanley is guilty of misappropriation; the record simply does not support a finding that the misappropriation was willful and malicious.

### G. *Attorney Fees*

Section 5 of ITSA provides that "[i]f ... willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party." 765 ILCS § 1065/5(iii) (West 1995). Inasmuch as we have reversed the trial court's finding of willful and malicious misappropriation, we necessarily vacate the award of attorney fees predicated on such a finding.

### H. *Injunctive Relief*

■■■■ Section 3 of ITSA provides that "(a) Actual or threatened misappropriation may be enjoined." 765 ILCS § 1065/3(a) (West 1995). According to the Illinois Supreme Court, the exact nature and duration of an injunctive remedy must be tailored to fit the facts of the case and an injunction should generally be only as broad as necessary to protect the rights of the plaintiff. *Abreu v. Unica Indus. Sales, Inc.*, 224 Ill. App.3d 439, 166 Ill.Dec. 703, 714, 586 N.E.2d 661, 672 (1991) (citing *Brunswick Corp. v. Outboard Marine Corp.*, 79 Ill.2d 475, 38 Ill.Dec. 781, 404 N.E.2d 205, 207 USPQ 1039 (1980) and *Village of Wilsonville v. SCA Serv., Inc.*, 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824 (1981)). In the case of a trade secret injunction, the rights of the plaintiff do not preclude development of technology by fair and honest means, such as by independent invention, accidental discovery, or facile reverse engineering. *See ILG Indus., Inc. v. Scott*, 49 Ill.2d 88, 273 N.E.2d 393, 396, 171 USPQ 371, 374 (1971).

### 1. *The first order*

■■■ In its first injunctive order (the first order) the trial court enjoined Stanley

> its agents, servants, and employees ... from participating or otherwise engaging in the continuous pinless hinge business (except as otherwise provided herein) in any manner whatsoever, including any manufacture, sale, purchase, marketing, promotion, solicitation, advertising, consultation, and/or other assistance of any others in such efforts, for a period of four (4) years.

Stanley contends that the first order is "facially overbroad and punitive" because it prohibits Stanley from "all forms of participation in the continuous pinless hinge business, including buying hinges for resale." Roton counters that it "ill-behooves a proven thief to seek judicial approbation to do indirectly what it cannot do directly." Roton maintains that if Stanley were allowed to sell Roton hinges "it would permit Stanley to continue the charade of using Select as a 'front'."

While we affirm the imposition of injunctive relief, we find that the first order may be interpreted too broadly. We agree with Stanley that the first order on its face prohibits lawful activity, such as buying continuous pinless hinges for resale. As there are concededly others in the pinless hinge business who have not been privy to Roton's trade secrets, it would be perfectly lawful for Stanley to buy hinges from these parties for resale. Such lawful activity would seem to be prohibited by the first order. It goes without saying, however, that Stanley should be prohibited from unlawful activity such as buying hinges from a party to which it has communicated Roton's trade secret information. We accordingly hold that the first order is too broad and we remand to the trial court for it to specify what unlawful activity is prohibited.

### 2. *The second order*

■■■ In its second injunctive order (the second order), the trial court additionally enjoined Stanley from "further using disclosing, and/or disseminating any of [Roton's]

trade secret business and technical information in any manner whatsoever."

Stanley maintains that the second order violates Rule 65(d) of the Federal Rules of Civil Procedure because it does not use specific terms or describe in reasonable detail the acts sought to be restrained.

We have stated that:

[i]f the potent weapon of judicial contempt power is to be brought to bear against a party for violation of an order, "one basic principle written into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits."

*KSM Fastening Sys., Inc. v. H.A. Jones Co.,* 776 F.2d 1522, 1526, 227 USPQ 676, 679 (Fed.Cir.1985). *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,* 986 F.2d 476, 480, 25 USPQ2d 1798, 1801 (Fed.Cir.1993) (Rule 65 requires specificity in order to relieve parties from the burden of adjudicating unwarranted contempt proceedings.).

The trial court's second order does not use specific terms or describe in reasonable detail the acts sought to be restrained. Specifically, the order does not set forth what the trade secret business and technical information is that cannot be disseminated. *See Tsuetaki v. Novicky,* 158 Ill.App.3d 505, 109 Ill.Dec. 180, 187, 509 N.E.2d 1019, 1026 (1983) (injunction overbroad which enjoined all information relating to plaintiff's manufacture of contact lenses; case remanded to give trial court an opportunity to specifically delineate what information was to remain confidential).

### 3. Conclusion

Because the first order is overbroad and the second order is unclear, we remand this issue to the trial court to make clear that lawful activities are permitted and to set forth in specific terms the act or acts sought to be restrained.

### I. Exclusion of "Trade Secret" Witnesses

Stanley also contends that the trial court committed reversible error when it refused to "permit Stanley to call three witnesses not listed on its initial witness list" who "would have directly impeached Baer's testimony" regarding Roton's maintenance of the confidentiality of its manufacturing processes. Stanley contends that these witnesses were proper either as direct or rebuttal witnesses.

We review evidentiary rulings under an abuse of discretion standard. *Munoz v. Strahm Farms, Inc.,* 69 F.3d 501, 503, 36 USPQ2d 1499, 1501 (Fed.Cir.1995) (citing *Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1547, 31 USPQ2d 1746, 1750 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1392, 131 L.Ed.2d 244 (1995)). In order for Stanley to obtain a new trial, it must show that the trial court abused its discretion in refusing to hear the testimony, and that this ruling challenged its substantial rights and were thus not harmless error. *Id. See DeBiasio v. Illinois Cent. R.R.,* 52 F.3d 678, 685 (7th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1040, 134 L.Ed.2d 188 (1996).

As to the impeachment of Baer, from the affidavits of record, it is certainly not clear that these witnesses in fact would have impeached Baer. In fact, the testimony of Upjohn would have corroborated Baer because his affidavit indicates that he was not given access to "the room in which [Roton] made the extrusion dies employed to make the extrusions for the Roton hinges." Accordingly, we conclude that the trial court did not err in refusing to admit the testimony of the three third parties.

Even assuming that the district court erred in not allowing Stanley's witnesses to testify, such error would have been harmless. The proffered testimony established only that certain third parties toured certain parts of the Roton plant. There is no indication that any specific or trade secret material was revealed on these tours. In fact, the extent of these tours is not provided and in one instance it is stated that the third party was prevented from having access to certain areas of the plant. This certainly indicates that Roton sought to protect any trade secret information. Accordingly, because the exclusion of the third party testimony did not prejudice Stanley's substantial rights or con-

stitute harmful error requiring a new trial, we find no abuse of discretion in the trial court's decision to exclude these witnesses.

### J. Conclusion as to Trade Secret Misappropriation

We affirm the trial court's holding of trade secret misappropriation and the award of actual damages. However, because the trial court erred in finding willful and malicious misappropriation, we vacate the awards of exemplary damages and attorney fees. Additionally, we remand on the issue of injunctive relief for the trial court to tailor such relief to the specific facts of this case. Finally, we do not disturb the trial court's exclusion of Stanley's "trade secret" witnesses.

### III. PREJUDGMENT INTEREST

■ Under Illinois law,

prejudgment interest may be recovered when warranted by equitable considerations, and disallowed if such an award would not comport with justice and equity. . . . Whether equitable circumstances support an award of [prejudgment] interest is a matter lying within the sound discretion of the trial judge. . . . Such a determination will not be disturbed on review unless it constitutes an abuse of discretion.

*In re Estate of Wernick,* 127 Ill.2d 61, 129 Ill.Dec. 111, 123, 535 N.E.2d 876, 888 (1989) (citations omitted).

The trial court's award of prejudgment interest was not an abuse of discretion. A relationship of confidence existed between Stanley and Roton which was breached when Stanley misappropriated Roton's trade secrets, making the award a matter of fairness and equity. In addition, the trial court's finding that Roton will not be entirely compensated absent such an award is supported by the record.

### IV. PATENT INFRINGEMENT

### A. The '008 Patent

The '008 patent is entitled "Multi-piece thrust bearing assembly for a hinge structure." The invention relates to a pinless hinge structure and more particularly to a multi-piece thrust bearing assembly for inhibiting relative longitudinal movement between the hinge members.

Fig. 2 of the '008 patent, shown below, illustrates hinge members 14 and 16 which respectively include gear segments 20 and 22 around which the hinge members rotate. The gear segments are kept together by clamp member 18.

As shown in Fig. 1, below, the hinge members are recessed and inside the recess is disposed a thrust bearing assembly 10. Above and below the assembly are bearing insert members which inhibit frictional sliding contact between the bearing member and the hinges.

Fig. 7 shows a side view of the thrust bearing member 40 which includes channels 54 and 56 which receive bearing portions 26 and 28 of the clamp 18. The bearing member is kept in place by a releasable fastener 66.

Claims 1 and 5 are at issue. Claim 1 is representative[2] and recites:

1. A multi-piece thrust bearing assembly for a pinless hinge structure including two intermeshed geared hinge members which are longitudinally movable relative to each other and a clamp member for maintaining the geared hinge members in mesh as they rotate, each geared hinge member including a gear segment extending along a longitudinal edge thereof, and an outwardly extending leg portion, said bearing assembly comprising:

bearing means disposed in adjacent longitudinal co-extensive lateral recesses defined along adjacent longitudinal edges of each hinge member and extending laterally across each gear segment of said hinge members to inhibit longitudinal movement of the hinge members relative to each other; and

bearing insert means arranged beneath the gear segment of each hinge member and an upper bearing surface of said bearing means and secured to said hinge members for enhancing hinge performance by reducing frictional sliding con-

2. Claim 5 is essentially the same as claim 1 except that it recites that the bearing insert means is non-metallic.

tact between the hinge members and said bearing means.

### B. *Infringement*

#### 1. *The Law of Infringement*

 Determining infringement is a two-step process. The first step is to determine the meaning and scope of the patent claim asserted to be infringed. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.) (*in banc*), *cert. granted,* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). We review claim construction, a question of law, de novo. *Id.* at 979, 34 USPQ2d at 1329.

 The second step is to compare the properly construed claim to that which is asserted to infringe. *Id.* at 976, 34 USPQ2d at 1326. Infringement requires that every limitation of a claim be met in the accused structure either exactly or by an equivalent. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935, 4 USPQ2d 1737, 1739–40

(Fed.Cir.1987) (*in banc*). "When literal infringement is not established, infringement may be proved under the doctrine of equivalents." *See Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 35 USPQ2d 1641 (Fed.Cir.1995) (*in banc*), *cert. granted,* —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). Infringement, both literal and under the doctrine of equivalents, is an issue of fact, reviewable under the clearly erroneous standard. *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575, 34 USPQ2d 1673, 1676 (Fed.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

#### 2. *Claim Construction*

 As did the trial court, we focus on the claim requirement that the bearing means be "disposed in adjacent longitudinal co-extensive lateral recesses." The '008 patent shows in Fig. 3, below, recesses 30 and 32.

The '008 specification states that

the hinge members 14, 16 define longitudinally co-extensive lateral recesses 30 and 32, respectively, along adjacent longitudinal edges thereof. As illustrated, each of the recesses 30, 32 has a stepped profile which is the mirror image of the other.

The specification further sets forth that

the stepped profile of each recess 30, 32 is further defined by providing each hinge member 14, 16 with laterally extending upper and lower shoulder portions 33 and 35 which are aligned with and vertically spaced from each other.

Roton contends that the claim phrase "adjacent longitudinal co-extensive lateral recesses" requires only that the cut-outs have a "common opening" and that therefore they may be offset from one another. However, this interpretation is inconsistent with the

quoted language of the '008 patent specification. In setting forth that the recesses are mirror images of each other and that the shoulder portions 33 and 35 are aligned and vertically spaced from each other, the '008 patent speaks explicitly in terms of recesses that are directly across from each other as opposed to being offset.

Roton additionally relies on the following colloquy between its attorney and Mr. Baer, the inventor of the '008 patent.

Q. What do you understand longitudinal co-extensive lateral recesses to mean when you use that term? ... [D]o the end points of each of the recesses have to be at the same place for them to be co-extensive?

A. No.

Baer's testimony on this point is unpersuasive. We have previously stated that an inventor's "after-the-fact testimony is of little weight compared to the clear import of the patent disclosure itself." *North American Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577, 28 USPQ2d 1333, 1337 (Fed. Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994).

In light of the clear language of the '008 specification, excerpted above, and Fig. 3, the only figure showing the recesses, we construe the language of claim 1, "adjacent longitudinal co-extensive lateral recesses," to require recesses that are directly across from each other and not offset.

### 3. *Infringement Under the Doctrine of Equivalents*

On appeal, the finding of no literal infringement is not contested. However, Stanley does contest the finding of infringement under the doctrine of equivalents.

#### a. *The law*

■■■■■■ Infringement under the doctrine of equivalents is a question of fact, which, when tried to the court, as in this case, is reviewed for clear error. *Hilton Davis,* 62 F.3d at 1521, 35 USPQ2d at 1647. In *Hilton Davis,* this court, in reviewing the doctrine of equivalents, stated that the traditional function, way, result tripartite test is not "the"

test for infringement under the doctrine of equivalents. *Id.* at 1518, 35 USPQ2d at 1645. Rather, a finding of infringement under the doctrine "requires proof of insubstantial differences between the claimed and accused products or processes." *Id.* at 1521–22, 35 USPQ2d at 1648. Thus, satisfaction of the tripartite test may not end the infringement inquiry. *See Sofamor Danek Group v. DePuy–Motech,* 74 F.3d 1216, 1221–22, 37 USPQ2d 1529 (Fed.Cir.1996) ("Evidence beyond function, way, and result informs application of the doctrine, which focuses on the substantiality of changes from the claims in the accused device.") "[E]vidence of copying or designing around, may also inform the test for infringement under the doctrine." *Hilton Davis* 62 F.3d at 1522, 35 USPQ2d at 1648.

In discussing the relevance of designing around to the issue of infringement under the doctrine, we stated that "[d]esigning around 'is the stuff of which competition is made and is supposed to benefit the consumer.'" *Id.* at 1520, 35 USPQ2d at 1646 (quoting *State Indus., Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236, 224 USPQ 418, 424 (Fed.Cir. 1985)). In addition, when a competitor is aware of a patent and attempts to design around it, "the fact-finder may infer that the competitor ... has designed substantial changes into the new product to avoid infringement" under the doctrine. *Id.* at 1520, 35 USPQ2d at 1646–47.

#### b. *Analysis*

■■■■ The trial court found infringement under the doctrine stating that the "bearing inserts which are placed in the recesses of both the '008 and the LS500 serve the same function (reducing longitudinal movement and subsequent sliding contact between the gear teeth and the thrust bearing), in substantially the same way, and produce substantially the same result." We conclude that the trial court's finding of infringement under the doctrine was clearly erroneous. In focusing solely on the function of the bearing inserts, the trial court seemingly failed to consider the substantial differences between the device as defined in claim 1 and the LS500 and the effects flowing therefrom.

Specifically, in the LS500, the cutouts are axially offset from one another to provide recesses in the opposed hinge leaves. In the recesses provided by the unaligned portions of the cutouts are disposed projecting portions of the bearing blocks. The bearing caps are disposed adjacent to the projecting portions and extend across the center line of the bearing block. According to Stanley, the LS500 was designed in this manner so that the bearing cap would extend along the surface of the bearing block, beyond the center line of the hinge, in order to transfer the weight of the door to the center of the bearing block. Such a design, it was felt, would avoid excessive wear and premature failure.

Additionally, we note that it is undisputed that Stanley was aware of the '008 patent and attempted to design around it. As we stated in *Hilton Davis,* such designing around provides an inference of no infringement under the doctrine. In this case, such an inference is clearly warranted. In addition to attempting to design around the '008 patent, the differences between the LS500 and claim 1 are not insubstantial. Stanley's recesses are offset in contradistinction to the plain language of claim 1. In addition, they are offset for a reason. Thus, viewing the evidence as a whole, and properly considering the doctrine of equivalents, we conclude that the findings that claim 1 and claim 5, which also requires "longitudinally co-extensive lateral recesses," are infringed under the doctrine of equivalents are clearly erroneous.

## C. *Willfulness, Treble Damages, and Attorney Fees*

The trial court found Stanley's infringement to be willful, trebled damages and awarded attorney fees. *See* 35 U.S.C. §§ 284–285 (1994). As we have reversed the holding of infringement, we necessarily vacate the finding of willfulness and the awards of treble damages and attorney fees.

## V. *PATENT VALIDITY*

Although we conclude that the '008 patent is not infringed, we nevertheless consider the validity of the '008 patent. *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1, 26 USPQ2d 1721 (1993) (Issues of patent validity that were decided at trial require appellate review, even when patents are found not infringed upon appeal.).

### A. *Obviousness*

#### 1. *Standard of Review*

Obviousness under section 103 is a question of law reviewed de novo. *In re Donaldson Co.,* 16 F.3d 1189, 1192, 29 USPQ2d 1845, 1848 (Fed.Cir.1994) (*in banc* ). What a reference teaches is a question of fact reviewed under the clearly erroneous standard. *In re Beattie,* 974 F.2d 1309, 1311, 24 USPQ2d 1040, 1041 (Fed.Cir.1992).

#### 2. *Analysis*

The trial court found that "Stanley has not proved by clear and convincing evidence that any of the prior art . . . renders obvious under 35 U.S.C. § 103, either Claims 1 or 5 of the '008 Patent." Stanley relies on U.S. Patent No. 3,991,436 issued to Nagase U.S. Patent No. 3,921,225 issued to Suska, and U.S. Patent No. 4,443,911 issued to Bannister asserting that these references render the claimed invention obvious.

The Nagase patent discloses a butt hinge in which a pair of rings is interposed between opposing ends of adjacent knuckles. Suska also discloses a butt hinge in which each knuckle includes an axial bore containing a plastic bushing. The Bannister patent discloses a device for interconnecting panels in which adjoining members are held together by the meshing of two gears and links spaced longitudinally along the members. The links are located above and below an injection molded plastic member.

We agree with the trial court that none of the prior art relied on by Stanley renders obvious the claimed invention. Specifically, the trial court's finding that none of the prior art discloses bearing means as claimed in claims 1 and 5 is not clearly erroneous. Only the Bannister patent discloses geared elements and plastic member 70 of Bannister cannot correspond to the claimed bearing means in that it does not operate to inhibit longitudinal movement of the members because it, too, is geared. Additionally, inas-

much as the prior art does not disclose the claimed bearing means, none of the prior art relied on discloses a bearing insert means which reduces the frictional sliding contact between the hinge members and the bearing means as claimed. We accordingly affirm the trial court's holding that the '008 has not been proved invalid under section 103.

## VI. CONCLUSION

The holding of trade secret misappropriation is affirmed. The award of actual damages for trade secret misappropriation is affirmed and the award of exemplary damages is reversed. The award of injunctive relief for trade secret misappropriation is vacated. The award of prejudgment interest is affirmed. The holding of infringement of the '008 patent is reversed and the finding of willfulness and the award of attorney fees are vacated. The holding as to validity of the '008 patent is affirmed. The case is remanded for further proceedings consistent with this opinion.

## VII. COSTS

Each party to bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.*

NIES, Senior Circuit Judge, additional views.

Because this panel is obligated to follow the precedent of *Hilton Davis Chemical Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 35 USPQ2d 1641 (Fed.Cir.1995) *(in banc ), cert. granted,* —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996), I join Judge Rich's opinion. *Hilton Davis* requires, *inter alia,* that to find infringement, the differences between the accused device and the claimed invention may not be substantial. In addition to the analysis set out in the majority opinion respecting the evidence on the substantiality of the differences here, I would also give significance to the fact that Stanley obtained a patent on its device over the prior art Roton patent. It is a truism that the fact that an accused device is itself patented does not preclude a finding that such device infringes

an earlier patent of another. However, the fact of a second patent, depending on its subject matter, may be relevant to the issue of whether the changes are substantial. *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1191 (Fed.Cir.1996) ("The fact of separate patentability is relevant, and is entitled to due weight."). If the second patent requires practice of the first i.e., the second merely adds an element "D" to a patented combination A + B + C, the combination A + B + C + D clearly infringes. Conversely, if the second patent is granted for A + B + D over one claiming A + B + C, the change from C to D must not have been obvious to be validly patented. Evidence of a patent covering the change, in my view, is clearly relevant unless the patent is invalid. A substitution in a patented invention cannot be both nonobvious and insubstantial. I would apply nonobviousness as the test for the "insubstantial change" requirement of *Hilton Davis.*

While I join the panel decision, I continue to disagree with the standard adopted in *Hilton Davis* for reasons stated in my dissenting opinion. *Id.* at 1550, 35 USPQ2d at 1672. In my view, where there are no factual issues respecting the accused device, as here, the issue of infringement under the doctrine of equivalents resolves into a question of law. *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 36, 50 S.Ct. 9, 11, 74 L.Ed. 147 (1929) ("Furthermore upon the undisputed evidence the question of infringement resolves itself in each case into one of law, depending upon a comparison between the structure disclosed [sic "claimed"] on the face of the patent and the [accused device], and the correct application thereto of the rule of equivalency."). I would hold as a matter of law that the accused hinges do not infringe. Nothing in the claims or the specification or prosecution history gives notice that the claims extend beyond what is claimed therein to equivalent components.