MINNESOTA MINING & MANUFAC-TURING COMPANY, Plaintiff,

v.

FELLOWES MANUFACTURING COMPANY, Defendant.

No. Civ. 98–1667 PAM/JGL.

United States District Court, D. Minnesota.

Nov. 23, 1999.

David K. Tellekson, J. Derek Vandenburgh, Jonelle R. Witt, Merchant & Gould, Minneapolis, MN, Terryl K. Qualey, Carolyn V. Peters, Michaele A. Hakamaki, St Paul, MN, for Minnesota Mining and Manufacturing Company, plaintiff.

Jack C. Berenzweig, Mark H. Remus, G. Peter Nichols, Brinks Hofer Gilson & Lione, Chicago, IL, Daniel E. Gustafson, Karla Marie Gluek, Heins Mills & Olson, Minneapolis, MN, for Fellowes Manufacturing Company, defendant.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon Cross Motions for Summary Judgment. For the reasons set forth below, the Plaintiff's Motion for Summary Judgment is granted and the Defendant's Motion for Summary Judgment is denied.

## BACKGROUND

Plaintiff Minnesota Mining & Manufacturing Company ("3M") owns U.S. Patent Number 5,713,544 ("the Wolf patent"), which is directed toward an elastomeric[1] gel-filled wrist rest for use with a computer keyboard. Such wrist rests are typically used to make typing more comfortable and alleviate harm to the user's wrists from carpal tunnel syndrome. 3M accuses the Defendant Fellowes Manufacturing Company ("Fellowes") of infringing the Wolf patent. Fellowes has counterclaimed that 3M's wrist rests, which are described by the Wolf patent, infringe its patent, U.S. Patent Number 5,356,099 ("the Sereboff patent"). The present Cross Motions for Summary Judgment concern only the Defendant's counterclaim under the Sereboff patent. The disputed patent claims of the Sereboff patent are quoted below.

1. A wrist support system positionally located adjacent a keyboard for alleviating symptoms of carpal tunnel syndrome, comprising:

 (a) a substantially planar and longitudinally extending support member mounted on a base surface adjacent said keyboard; and

 (b) a *liquid containing pack* positionally located contiguously and substantially conforming to at least a portion of a user's palm and wrist when said user is operating said keyboard for resilient supporting said user's palm and wrist, said *liquid* substantially filling an interior volume of said *liquid containing pack*.

3. The wrist support system as recited in claim 1, where said *liquid containing pack* includes a *gel* composition contained therein.

20. The wrist support system as recited in claim 1 where said *liquid containing pack* is a *gel* pack.

(Sereboff patent at col. 5–6.) (emphasis added). Fellowes has asserted that 3M infringes claims 3 and 20 of the Sereboff patent. (*See* Def.'s Mem. in Opp'n at 11.) These claims, which set out the metes and bounds of Fellowes' intellectual property

---

1. The term "elastomeric" means having elastic properties. *See* Webster's Third New International Dictionary 730 (1986).

right, are in dependent form because they each refer to claim 1. As such, dependent claims 3 and 20 incorporate all the language of independent claim 1, to which they refer.

## A. 3M's Motion For Summary Judgment

3M argues that independent claim 1 of the Sereboff patent requires that the claimed wrist rest be filled with a liquid. (*See* Pl.'s Mem. in Supp. at 5.) According to 3M, the term "gel" in dependent claims 3 and 20 is restricted to liquid gels because these dependent claims incorporate all the limitations of independent claim 1, including its term "liquid." (*See id.*) 3M proposes that the term "liquid" requires flow, no definite shape, and no deformability. (*See id.* at 3.) Because 3M's wrist rests are filled with an elastomeric gel that 3M claims does not flow, 3M argues that its wrist rests do not infringe the asserted claims of the Sereboff patent. (*See id.* at 4.)

## B. Fellowes' Motion For Summary Judgment

Fellowes argues that the Sereboff patent provides a special definition of "liquid" that includes both solids and liquids, as well as the elastomeric gels used in 3M products. (*See* Def.'s Mem. in Opp'n at 6–7.) Fellowes also argues that the 3M gel is a liquid because it leaks from holes in the bottom of the wrist rest. (*See id.* at 2.) On these grounds, Fellowes asserts that the accused 3M wrist rests literally infringe the Sereboff patent because they meet the literal definition of "liquid" as that term is used in the Sereboff patent. (*See id.* at 11.) Alternatively, Fellowes contends that the 3M products infringe the Sereboff patent under the doctrine of equivalents. (*See id.*) According to Fellowes, 3M's elastomeric gel and Sereboff's liquid filling both perform the function of supporting the user's wrists in substantially the same way, which indicates that these elements are equivalent. (*See id.* at 12.)

## DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quotation omitted).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *See Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957.

### B. Claim Construction

A literal patent infringement analysis involves two steps. The first step, claim construction, determines the meaning and scope of the patent claim alleged to be infringed. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir. 1995). After claim construction, the sec-

ond step then compares the properly construed claim to the product accused of infringing. *See id.*

 Claim construction is a question of law to be determined by the Court. *See Markman*, 52 F.3d at 976. To determine the meaning and scope of a patent claim, the Court first considers intrinsic evidence, i.e., the claim language, the written description,[2] and the prosecution history[3] of the patent in proceedings before the U.S. Patent & Trademark Office. *See Markman*, 52 F.3d at 979; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). When the intrinsic evidence does not resolve a disputed claim term, the Court may also receive extrinsic evidence to aid in claim interpretation. *See Markman*, 52 F.3d at 980; *Vitronics*, 90 F.3d at 1583. In this case, the parties differ as to the proper meanings of the terms "liquid," "gel," and "liquid containing pack" as used in the Sereboff patent.

### 1. *Intrinsic Evidence*

#### a. *Claim Language*

 The Court first considers the intrinsic evidence to determine the proper meaning and scope of the disputed terms "liquid," "gel," and "liquid containing pack" as used in the Sereboff patent. In analyzing the intrinsic evidence, the Court first considers the language of all the claims, both asserted and nonasserted. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995). Although the words in a claim are usually given their ordinary and customary meaning, a patentee may act as a lexicographer, giving the claim language a meaning different from the ordinary and customary usage of the words. *See Vitronics*, 90 F.3d at 1582. In this case, Fellowes essentially argues that all "gels" are subsumed within the term "liq-

uid," and that "liquid" is specially defined by the written description of the Sereboff patent to include 3M's elastomeric gel. (*See* Def.'s Mem. in Opp'n at 6–7, 10.) 3M offers an interpretation in which the term "liquid" includes only "liquid gels," while "solid gels" are not included within the term "liquid." (*See* Pl.'s Mem. in Supp. at 5–7, 15.)

 The Court first examines the relationship between independent claim 1, which includes the term "liquid," and dependent claims 3 and 20, which include the term "gel." A dependent claim can only further define (i.e., add narrowing limitations to) an independent claim; it cannot substitute one element for another specified in the independent claim. *See* Manual of Patent Examining Practice § 608.01(n) (7th ed.1998). This convention of patent practice means only that "liquid" and "gel" cannot be mutually exclusive, for that would improperly substitute "gel" in dependent claims 3 and 20 for "liquid" in independent claim 1. Moreover, under the doctrine of claim differentiation, different claims are presumed to have different scopes. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed.Cir.1998). This suggests that the term "liquid" in claim 1 is broader than the term "gel" in claims 3 and 20. For example, "liquid" in claim 1 includes water, which is not a "gel" within the scope of claims 3 and 20. These observations, however, while helpful in construing the claim language, do not resolve the dispute over whether all "gels" are completely subsumed under the term "liquid."

#### b. *Written Description*

 Accordingly, the Court turns to the Sereboff patent's written description, which is also sometimes referred to as the

---

**2.** The written description of a patent is sometimes referred to as the patent specification. In addition to describing the invention and the process of making and using it, the written description serves to enable one skilled in the art to practice the invention and the best mode of doing so. *See* 35 U.S.C. § 112.

**3.** The prosecution history, which is sometimes referred to as the "file wrapper," is the complete record of all the proceedings before the U.S. Patent & Trademark Office, including examination of the patent application. Such proceedings are referred to as patent prosecution.

patent specification. For the patentee to use terms in a claim differently from their ordinary meaning, the special definition of the claim term must be clearly enunciated in the written description or prosecution history of the patent. *See Vitronics*, 90 F.3d at 1582. Fellowes argues that the written description clearly indicates that the term "liquid" includes elastomeric gels because the written description of the Sereboff patent includes a reference to U.S. Patent Number 5,173,963 ("the Greenberg patent"), which discloses an elastomeric nonflowing gel. (*See* Def.'s Mem. in Opp'n at 6–7.) This argument is without merit.

The Sereboff patent's mere reference to the Greenberg patent fails to satisfy the *Vitronics* requirement of providing a clear and explicit special definition of any special usage of a claim term. First, the Greenberg patent is discussed only in the "Background of the Invention" section of the Sereboff patent, and is mentioned only in the context of identifying possibly relevant prior art, not to identify the actual subject matter of Sereboff's claimed invention. (*See* Sereboff patent at column 1, lines 35–41.) Moreover, the Sereboff patent fails to identify nonflowing elastomeric gels as being the important feature of the Greenberg patent for which reference to the Greenberg patent is made. (*See id.*) Furthermore, the Sereboff patent fails to incorporate the subject matter of the Greenberg patent by reference, such that the disclosure in the Greenberg patent is not considered to be part of the disclosure of the Sereboff patent. *See In re Howarth*, 654 F.2d 103, 107 (Cust. & Pat.App.1981) (requiring a patent applicant to either "set forth the information in his specification or incorporate it by reference to a reasonably accessible source"); *In re De Seversky*, 474 F.2d 671, 673 (CUst. & Pat.App.1973) (refusing incorporation where no "incorporation-by-reference" language existed in the application); Manual of Patent Application Practice and Procedure § 608.01(p) (7th ed. 1998) ("Mere reference to another application, patent, or publication is not an incorporation of anything therein into the application containing such reference for the purpose of the disclosure required by 35 U.S.C. 112, first paragraph."). For these reasons, the Court finds that the Sereboff patent's mere reference to the Greenberg patent does not provide a special definition of the term "liquid" that includes elastomeric gels.

Other portions of the Sereboff patent's written description must also be considered in interpreting the term "liquid." Fellowes argues for attaching a special meaning to "liquid" based on the following portion of the Sereboff patent's written description:

> As is seen in FIG. 3, pack **30** includes a substantially liquid type composition **34** which may be in the form of a liquid having a viscosity approximating the viscosity of water, or may include a gel composition contained therein having a viscosity substantially above that of water.

(Sereboff patent at column 3, lines 53–68, emphasis in original.) The Court finds that this explicit language is sufficiently clear to constitute a special definition of the claim term "liquid." Under this special definition, the "liquid" of claim 1 of the Sereboff patent includes both a substance at about the viscosity of water and also gels having a viscosity substantially above that of water. (*See id.*) The written description of the Sereboff patent does not impose an upper bound on the viscosity of gels considered to be within the special definition of the claim term "liquid." (*See id.*) Thus, the written description of the Sereboff patent indicates that the term "liquid" appears to include all "gels" that can be regarded as having a viscosity.

c. *Prosecution History*

■ Having decided, based on its written description, that the Sereboff patent created special definitions of the terms "liquid" and "gel" at the time the patent application was filed, the Court next turns to the prosecution history to determine if this understanding of the meaning of "liquid" and "gel" was later modified during

prosecution of the Sereboff patent application before the U.S. Patent & Trademark Office. Both claim amendments and mere arguments for patentability, along with other aspects of the prosecution history, must be examined to determine the meaning of terms in the claims. *See Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995). The patentee cannot treat the claim as a "nose of wax," having one meaning during prosecution, and yet another altogether during litigation. *See Senmed, Inc. v. Richard–Allan Med. Indus.,* 888 F.2d 815, 819 n. 8 (Fed.Cir.1989) (citing *White v. Dunbar,* 119 U.S. 47, 51–52, 7 S.Ct. 72, 30 L.Ed. 303 (1886)).

▮▮▮ During prosecution of the Sereboff patent application, the claims were rejected as being obvious[4] based on U.S. Patent Number 5,228,665 ("the Garcia patent," disclosing a foam slab wrist rest) in view of U.S. Patent Number 4,896,388 ("the Bard patent," disclosing a pillow using both a compressible filling and a water filling). In arguing for patentability, Sereboff stated:

> Unlike the Garcia system, the inventive concept of the [Sereboff] Application is not directed to a support system which provides firmness sufficient to restrict the movement of a user's wrists, nor to one which urges the user's wrists to maintain a fixed desirable position. Rather, it is directed to accommodating the free movement of the user's wrists and palms by the use of a *fluid support mechanism* which resiliently *conforms* to the contours of the user's wrists and palms, *even while* they are *moving.*

(Witt Decl.Ex. 7 at 47 ("Sereboff prosecution history").) (emphasis added) The Court finds that these explicit arguments during prosecution of the Sereboff patent created two additional constraints on the claims. First, the support mechanism must be fluid. (*See id.*) Second, the support mechanism must dynamically conform to the user's wrists while they are moving.

(*See id.*) The first constraint provides additional insight into the proper interpretation of the claim terms "liquid" and "gel," i.e., the support mechanism must be "fluid." The second constraint does not affect the Court's literal infringement analysis.

The term "fluid" limits the "gels" included within the claim term "liquid" to only those gels that *flow.* Gels that do not flow are not "liquid," as that term was defined by the Sereboff patent application and further limited by Sereboff during prosecution. Stated differently, use of the term "fluid" during prosecution of the Sereboff patent allows the Court to conclude that the term "gel" is not subsumed within the term "liquid." The intrinsic evidence indicates that the term "liquid" in independent claim 1 limits the "gels" in claims 3 and 20 to only those gels that flow; nonflowing gels are not within the scope of the Sereboff patent claims.

### 2. *Extrinsic Evidence*

When the intrinsic evidence does not resolve a disputed claim term, the Court may also receive extrinsic evidence to aid in claim interpretation. *See Markman,* 52 F.3d at 980; *Vitronics,* 90 F.3d at 1583. In this case, the intrinsic evidence clearly limits the claimed "liquid" to include only those gels that flow. However, an examination of the extrinsic evidence provided by Fellowes' own expert, Dr. Larson, confirms the above claim construction based on the intrinsic evidence.

Dr. Larson submitted an expert report in which he stated that "both the ordinary and scientific meanings [of 'liquid'] describe it as a substance that flows.... The term 'liquid' can refer to substances that flow or deform reversibly only when modestly large forces are imposed." (Larson Decl. ¶ 3.) "If a gel is flowable, then the network structure must be capable of being broken down under a load or force, and to reform itself once that load is removed.

---

4. A patent cannot be obtained for subject matter sought to be patented that is deemed "obvious" by the patent examiner. *See* 35 U.S.C. § 103.

Block copolymer formulations possess this property...." (*Id.* ¶ 10.) "The [3M] block copolymer formulation ... fits within the range of gel possibilities envisioned by Sereboff." (*Id.* ¶ 12.) "The [term] ... liquid ... as used in claim 1 of the Sereboff patent [is] intended to exclude substances like foam rubber that cannot deform irreversibly or 'flow,' but instead spring back into a predetermined shape after the deforming force is removed." (*Id.* ¶ 17.) This terminology is also "intended to exclude nonflowable elastic substances...." (*Id.* ¶ 19.)

These statements by Dr. Larson clearly limit the claimed "liquid" to only those substances that flow. Dr. Larson admits that "nonflowable elastic substances" are not included within the scope of the Sereboff patent claims. (*Id.* ¶ 19.) Thus, if the 3M gel is either nonflowable or elastic, it does not infringe the Sereboff patent. Dr. Larson also sheds further light on the meaning of "flow" and "flowable." If the 3M gel "springs back into a predetermined shape after [a] deforming force is removed," it does not flow and does not infringe the Sereboff patent. (*See id.* ¶ 17.) Moreover, if the 3M gel is incapable of *reforming itself* after being broken down, then it does not infringe. (*See id.* ¶ 10.) (emphasis added). The Court interprets the words "reforming itself," based on their plain meaning, to mean "reforming on its own accord" rather than "capable of being reformed." Thus, if reforming the 3M gel back to its predetermined shape (after the gel is broken down) requires an externally applied force, then the 3M gel does not infringe.[5] In summary, the Court finds that the extrinsic evidence offered by Fellowes also indicates that the claimed "liquid" must flow. The Court further finds that the claimed "liquid" must be inelastic, and it must be capable of reforming itself back into a predetermined shape after being broken down.

5. Although Dr. Larson states that block copolymer formulations are able to reform themselves, he does not state that *all* block copo-

## C. Literal Infringement Comparing Claims to Accused Products

■■■ Having determined the scope and meaning of the claims, the Court next turns to the second step of the literal infringement analysis, that is, comparing the properly construed claims asserted by Fellowes to the accused 3M wrist rests. *See Markman,* 52 F.3d at 976. Literal infringement exists only where each and every claim limitation is exactly met in the accused product; if even one claim limitation is not found in the accused product, it does not infringe the patent claim. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935 (Fed.Cir.1987). "[T]he determination of whether the properly construed claims read on the accused device is a question of fact. Thus, summary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1304 (Fed.Cir. 1999).

### 1. Does the 3M Gel Flow?

■■ Asserted claims 3 and 20, which incorporate all the limitations of independent claim 1, include only "liquid" gels, that is, gels that flow. The only 3M wrist rests for which Fellowes has provided any evidence of a gel that flows are the defective 3M wrist rests that leaked gel from holes in the plastic base supporting the gel pad. (*See* Def.'s Mem. in Opp'n at 2.) However, these gels that flowed and leaked are in the very 3M products that cannot infringe the Sereboff patent on another basis. By definition, the products having gels that flowed and leaked do not have a "liquid-containing pack." Such a liquid-containing pack is clearly required by independent claim 1 and, by incorporation, by dependent claims 3 and 20. The

lymer formulations act this way, or that the accused 3M elastomeric gel acts this way. (*See id.* ¶ 10.)

Court finds that those 3M wrist rests that have at least one hole in the liquid-containing pack do not literally infringe the Sereboff patent because the "liquid-containing pack" limitation is not present in these products.[6]

 Other than the defective 3M wrist rests that leaked gel, Fellowes has provided no evidence that the 3M wrist rests include a gel that flows. Fellowes' expert, Dr. Larson, stated only that the 3M gel, as described by the Wolf patent, fits within the range of gel possibilities envisioned by Sereboff, which is not necessarily coextensive with those gels actually claimed by Sereboff. (*See* Larson Decl. ¶ 12.) In reaching this conclusion, Dr. Larson improperly relied on the disclosure of the Greenberg patent which, as discussed above, is not a proper part of the Sereboff patent's disclosure. (*See id.* ¶ 11.) Dr. Larson stated only that one ingredient of the 3M gel is a flowable liquid; he did not state that the 3M gel, as a whole, flows. (*See id.* ¶ 12.) In summary, Fellowes has provided no evidence that the 3M gel flows in a product that includes a liquid-containing pack, as required by a proper interpretation of the claim term "liquid." The Court finds that the 3M wrist rests do not literally infringe the Sereboff patent because the gel filling does not flow[7] and is therefore not a "liquid."

## 2. *Is the 3M Gel Elastic?*

Having already identified two elements not found in the accused 3M products (i.e., a "liquid" and, in some 3M wrist rests, a liquid-containing pack), the Court proceeds to analyze other possible bases of noninfringement. Fellowes admits that if the 3M gel is elastic, it does not infringe the Sereboff patent. (*See* Larson Decl. ¶¶ 17, 19.) A substance is elastic if it "spring[s] back into a predetermined shape after [a] deforming force is removed." (*See* Larson Decl. ¶ 17.) Fellowes admits that the accused 3M wrist rests dynamically conform to the user's wrists during use. (*See* Def.'s Reply at 9.) This means that the 3M wrist rest gel is elastic because, as discussed above, the conformal function does not result from fluid flow. Moreover, Fellowes admits for the purposes of this motion that the accused 3M wrist rests are described by the Wolf patent. (*See* Def.'s Mem. in Opp'n at 1, n. 2.) The Wolf patent describes the gel material as being highly elastic. (*See* Remus Decl.Ex. M ("Wolf patent") at column 2, line 32.) The Court finds that the 3M wrist rests do not literally infringe the Sereboff patent because the gel filling of the accused products is elastic.

## 3. *Can the 3M Gel Reform Itself After Being Broken Down?*

Fellowes admits that, by definition, a flowable gel must have a network structure that is capable of *reforming itself* to its predetermined shape after being broken down. (*See* Larson Decl. ¶ 10.) (emphasis added). However, Fellowes has set forth no evidence that 3M's gel filling does so. Dr. Larson's general statement that block copolymer formulations reform themselves falls short in this regard. (*See id.* ¶ 10) Dr. Larson may simply be trying

---

**6.** Based on information requested by the Court at oral argument on October 22, 1999, the following 3M wrist rest models include a hole in the liquid-containing pack and therefore do not literally infringe the Sereboff patent: WR410, WR410BE, WR510, WR511, WR511BE, WR512, WR512BE, AKT100, AKT100EK, AKT100SA, AKT100N, AKT200, AKT200ST, AKT200K, AKT200KST, AKT200SL, AKT200SKST, AKT200EK, and AKT200EKST.

**7.** 3M submitted physical samples of its WR310GY and WR410 wrist rests. (*See* Witt. Decl.Ex. 10, 12.) Both parties urged the Court to cut open the 3M wrist rest gel pack to inspect the elastomeric gel filling. (*See* Def.'s Mem. in Opp'n at 1, Pl.'s Reply at 14.) During oral argument on October 22, 1999, a WR410 wrist rest was cut open. After nearly a month's time, the Court has yet to observe any sign of the slightest flow. Based on this demonstration and all the other evidence of record, the Court finds that no reasonable jury would conclude that the 3M elastomeric gel filling flows.

to say that in his opinion, a substance is only a block copolymer if it is capable of reforming itself. He does not state outright that the 3M gel is a block copolymer that is capable of reforming itself. (*See id.*) Although the 3M wrist rest elastically deforms and rebounds to its original shape, as discussed above, no evidence indicates that it does so after the network structure of the gel filling is broken down. For this reason, the Court finds that the accused 3M wrist rests do not literally infringe the Sereboff patent.

**D. Doctrine of Equivalents**

Having decided that the accused 3M products do not literally infringe the properly construed claims of the Sereboff patent, the Court next determines whether such infringement exists under the doctrine of equivalents. "Even if an accused product differs enough from an asserted claim to preclude literal infringement, that product may infringe under the doctrine of equivalents if there is equivalence between those elements of the accused product and the claimed limitations of the patented invention that are not literally infringed." *Zelinski v. Brunswick Corp.,* 185 F.3d 1311, 1316 (Fed.Cir.1999) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)).

"Infringement under the doctrine of equivalents is a question of fact." *K–2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1366 (Fed.Cir.1999) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 609–10, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). "At trial, the patentee bears the ultimate burden of proving equivalence." *Id.* (citing *Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1196 (Fed.Cir.1994)). Summary judgment is appropriate, however, under the doctrine of equivalents when no reasonable jury could determine that the claim limitation and the accused elements are equivalent. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

■ "Infringement lies under the doctrine only if an equivalent or a literal correspondence of every limitation of the claim is found in the accused device." *Zelinski,* 185 F.3d at 1316 (citing *Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040). "An element is equivalent if the differences between the element and the claim limitation are 'insubstantial.' " *Id.* at 1316–17 (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)).

1. *Function/Way/Result Test For Insubstantial Differences*

■ Even though the gel filling of the 3M wrist rests does not literally meet the claimed "liquid" filling limitation of the Sereboff patent, these elements may be nonetheless be equivalent under one test for insubstantial differences if they perform substantially the same function, in substantially the same way, to obtain substantially the same result. *See Zelinski,* 185 F.3d at 1316–17 (citing *Graver Tank,* 339 U.S. at 608, 70 S.Ct. 854). Although the exact function of the disputed "liquid" filling is not specifically addressed by either the Sereboff patent or its prosecution history, the "liquid" filling must at least contribute in some way to the function of the liquid-containing pack of which it is an integral part. The Sereboff patent clearly sets forth the function of the liquid-containing pack: "to be resilient in contour and deformable." (Sereboff patent at column 4, lines 1–2.) Arguments during prosecution further explained that the function of this "fluid support mechanism" is to "resiliently conform[ ] to the contours of the user's wrists and palms, even while they are moving." (Witt Decl.Ex. 7 at 47 ("Sereboff prosecution history").) For these reasons, the Court finds that the function of the "liquid" filling is to assist in providing support that is resilient in contour and deformable, and which dynamically conforms to and supports the user's wrists during use. The Court further finds that the gel-filling of the accused 3M wrist rests also provides substantially the

same function. Thus, the first step of the conjunctive function/way/result test for insubstantial differences does not dispose of the issue of infringement under the doctrine of equivalents.

Accordingly, the Court next examines whether 3M's gel-filled pad performs this function in substantially the same way as Sereboff's liquid containing pack. The Court concludes that it does not. Arguments by a patent applicant that constitute a clear and unmistakable surrender of subject matter preclude the recapture of that subject matter under the doctrine of equivalents, even where those arguments were not necessary to overcome the prior art. *See Litton Sys., Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1458, 1462 (Fed.Cir.1998). To determine what subject matter has been relinquished, an objective test is applied, inquiring "whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.,* 170 F.3d 1373, 1377 (Fed.Cir.1999).

During prosecution, Sereboff clearly stated that "the inventive concept of the [Sereboff] Application is not directed to a support system which ... restrict[s] the movement of a user's wrists ... nor to one which urges the user's wrists to maintain a fixed desirable position." (Witt Decl.Ex. 7 at 47 ("Sereboff prosecution history").) The Court finds that these unambiguous admissions of what is not considered within the scope of the Sereboff patent constitute a clear and definite surrender of subject matter upon which a competitor could reasonably rely. Fellowes also admits, for the purposes of this motion, that the 3M products operate as described in the Wolf patent. (*See* Def.'s Mem. in Opp'n at 1, n. 2.) The Wolf patent provides that movement of the users' supported wrist, in the horizontal plane of the wrist rest, is limited to a circular area approximately between one-half inch and one inch in diameter. (*See* Wolf patent at column 4, lines 56–64.) Thus, the 3M products function in such a way so as to restrict the user's wrists to maintain a fixed position so as to fall within that subject matter surrendered by Sereboff during prosecution. In summary, the prosecution history unambiguously limits the way in which the Sereboff "liquid" filling performs its function, and the gel filling in the accused 3M wrist rests does not perform this function in that particular way. Thus, the function/way/result test indicates that substantial differences exist between the accused 3M products and the Sereboff patent claims, such that no infringement exists under the doctrine of equivalents.

### 2. *Issuance of the Wolf Patent Over the Sereboff Patent*

█ During the examination of 3M's Wolf patent application by the U.S. Patent & Trademark Office, the patent examiner had before him the prior art Sereboff patent, which he specifically considered in determining whether the Wolf patent application was patentable. (*See* Witt Decl. Ex. 10 at 61 ("Wolf prosecution history.")) While not dispositive, the grant of a patent on the accused product over the prior art patent being asserted against the accused product,[8] is probative of substantial differences indicating nonequivalence. *See Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1570 (Fed.Cir.1996). This is particularly so when the second patent claims a substitution of components rather than an addition of components. (*See Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1128 (Fed.Cir.1996)) (Nies, J., additional views).

The present case involves just such a substitution of the 3M elastomeric gel for the "liquid" gel filling claimed by Sereboff, for which 3M obtained allowance of the Wolf patent over the Sereboff patent.

---

8. Granting a patent over a prior art patent simply means that in examining the second patent, the patent examiner considered the relevance of the prior art patent. If the second patent is then granted, it enjoys at least a presumption of patentability, i.e., it is presumed new, useful, and nonobvious. *See* 35 U.S.C. §§ 101–103; *Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1570 (Fed.Cir.1996).

During 3M's prosecution of the Wolf patent, the U.S. Patent & Trademark Office patent examiner recognized that the Sereboff patent disclosed all of the features claimed in the Wolf patent, except that the Sereboff patent did not teach or suggest that the particular gel should be an elastomeric block polymer gel. (*See* Witt Decl.Ex. 10 at 61 ("Wolf prosecution history").) The patent examiner found that U.S. Patent 3,676,387 ("the Lindlof patent") teaches an elastomeric block polymer gel for the purpose of cushioning and shock absorbing. (*See id.*) Ultimately, however, the patent examiner found that it would not have been obvious to use an elastomeric block polymer gel in a wrist rest pad for providing conformable cushioning support rather than impact-type shock absorbing. (*See id.* at 124 ("Examiner Interview Summary Record").) The Wolf patent was granted on this basis. (*See id.*) Thus, the Court finds that issuance of the Wolf patent over the Sereboff patent confirms the finding of nonequivalence based on the function/way/result test.

### CONCLUSION

Accordingly, for the foregoing reasons, and upon all of the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Plaintiff's Motion for Summary Judgment of Non–Infringement of U.S. Patent No. 5,356,099 (Clerk Doc. No. 49) is **GRANTED** as to Count 2 of the Defendant's First Amended Answer and Counterclaim (Clerk Doc. No. 15), which is hereby **DISMISSED WITH PREJUDICE;** and

2. Defendant's Motion for Summary Judgment of Infringement of U.S. Patent No. 5,356,099 (Clerk Doc. No. 55) is **DENIED.**